[No. H027086. Sixth Dist. Feb. 4, 2005.]

In re ISIDRO FERNANDEZ DeLUNA, on Habeas Corpus.

**COUNSEL**

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Frances T. Grunder, Assistant Attorney General, Anya M. Binsacca and Song J. Hill, Deputy Attorneys General, for Appellant the People.

Steve M. Defilippis, under appointment by the Court of Appeal, for Respondent Isidro Fernandez DeLuna.

**OPINION**

**WALSH, J.**[*]—On July 7, 1985, defendant Isidro Fernandez DeLuna shot a man to death outside a bar after a drunken argument. Later he pleaded guilty to second degree murder and received an agreed sentence of 17 years to life.

At a hearing on March 27, 2002, the Board of Prison Terms (Board) denied defendant a parole release date and determined that it was not likely

---

[*]Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

defendant would be granted parole in the next three years. The Board concluded "that [defendant] is not suitable for parole and that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."

Here we will conclude that, though certain of the Board's findings were supported by "some evidence" (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 658 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*)), a number of the Board's findings lacked evidentiary support. In light of this conclusion it is prudent to remand the matter for the Board to reconsider its decision in light of defendant's actual record.

### THE COMMITMENT OFFENSE

On July 7, 1985, defendant, then age 30, and his friends argued with the victim and his friends in a restaurant bar in Morgan Hill.[1] Defendant said he was challenged to fight, so he went outside, where the victim, Fernando Renteria, then age 41, hit defendant in the face once or twice without provocation. They all went back inside the bar and continued drinking. Defendant and his friends left.

Defendant retrieved a .22-caliber rifle and drove back to the bar. As Renteria was about to enter his own car, defendant drove up and both defendant and his passenger began shooting at Renteria. Renteria was shot in the right elbow.[2] He fell down, got up, and challenged them to kill him. Renteria was shot in the face. Renteria walked through the parking lot, spitting blood and tooth fragments. Defendant followed him and fired a shot that struck a nearby gas pump. Renteria called for his brother and walked among wooden boxes in the parking lot. He was killed by a shot in the back that perforated his thoracic aorta and left lung. After this shot, Renteria ran up to the restaurant door and collapsed. Defendant drove off and was taken into custody later the same night. Defendant attributed the shooting to his intoxication. Additional facts about the offense are set out below where relevant.

### THE GUILTY PLEA

On August 29, 1985, defendant pleaded guilty to second degree murder and admitted that he personally used a firearm. On October 11, 1985, pursuant to the plea agreement, defendant was committed to prison for the

---

[1] Since defendant pleaded guilty, this summary is taken from the original probation report.

[2] Eyewitnesses described Renteria as being shot in the shoulder, but the autopsy only recorded an arm wound to the elbow.

indeterminate term of 17 years (15 plus two for the firearm use) to life. Defendant's minimum eligible parole date was August 17, 1996.

## THE PAROLE HEARING

On March 27, 2002, the Board conducted a hearing to determine defendant's suitability for parole. The Board considered as evidence defendant's prison file, the transcript of an earlier parole hearing, testimony by defendant, letters in support of defendant, and opposing argument by a deputy district attorney.

At the end of the hearing the Board orally concluded "that the prisoner is not suitable for parole and that he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board's decision was based on the following factors: (A) considering the nature of the commitment offense, the Board found that "the prisoner committed the offense in an especially cruel and callous manner"; (B) considering defendant's criminal history, the Board found that "the prisoner has an escalating pattern of criminal conduct"; (C) the Board found that defendant has "an unstable social history"; (D) considering defendant's institutional behavior, the Board found that "you've programmed in a limited manner, you've failed to upgrade educationally or vocationally as previously recommended." "[T]he prisoner still needs therapy . . . ." The Board's findings are quoted more fully where relevant below.

## THE HABEAS CORPUS PROCEEDINGS

On June 20, 2003, defendant filed a petition for writ of habeas corpus in the Santa Clara County Superior Court. On July 2, 2003, the trial court issued an order to show cause. On January 20, 2004, after considering the administrative record and other documents, the court granted defendant's petition for habeas corpus and remanded the matter to the Board to reconsider its decision. The court found, among other things: (A) "it can not be said that [defendant's] crime was 'especially' cruel or callous" (fn. omitted); (B) defendant has no criminal history; (C) defendant "has been a model inmate" and there was no evidence that he needed additional therapy-the Board simply ignored the experts and made a contrary finding. The trial court made no express findings about (D) defendant's social history.

In remanding the matter to the Board, the trial court's order "precluded" the Board "from relying on any of the purported reasons it previously articulated as outlined above." The order also "precluded" the Santa Clara County District Attorney "from opposing parole based on the gravity of the commitment offense." According to the trial court, the district attorney's opposition violated defendant's plea bargain.

## 1. STANDARD OF REVIEW

When a decision by the Board denying parole is challenged, "the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. " (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.) "Only a modicum of evidence is required." (*Id.* at p. 677.) As we explain more fully below, if one or more of the factors lacks evidentiary support, we also consider whether the decision "satisfies the requirements of due process of law" because the factors for which there is some evidence "constitute a sufficient basis supporting the . . . discretionary decision to deny parole." (*Ibid.*)

When, as here, the trial court rules on a habeas corpus petition without conducting an evidentiary hearing, we independently review the documentary evidence on appeal. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677; *In re Smith* (2003) 114 Cal.App.4th 343, 360–361 [7 Cal.Rptr.3d 655].) However, "[r]esolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority" of the Board. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

## 2. REVIEW OF THE BOARD'S FINDINGS

One of the Board's functions is to set parole dates for prisoners serving indeterminate sentences. (Pen. Code, §§ 3040, 3041, subd. (a), 3000, subd. (b)(4) & (7).) Penal Code section 3041, subdivision (b) requires the Board to "set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." This statute creates a conditional liberty interest for a prospective parolee. (Cf. *Rosenkrantz, supra,* 29 Cal.4th at p. 661; *McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 901–902.) The Board has broad discretion, sometimes called " ' "great" ' " and " ' "almost unlimited," ' " to identify and weigh the factors relevant to predicting "by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." (*Rosenkrantz, supra,* 29 Cal.4th at p. 655.) However, "the requirement of procedural due process embodied in the California Constitution (Cal. Const., art. I, § 7, subd. (a)) places some limitations upon the broad discretionary authority of the Board." (*Ibid.*) A prisoner is entitled to "an individualized consideration of all relevant factors." (*Ibid.*)

■ Title 15, section 2402 of the California Code of Regulations identifies factors relevant to parole suitability and unsuitability.[3] These factors are general guidelines, the importance of which is left to the Board to determine. (§ 2402, subds. (c) & (d); cf. *Rosenkrantz, supra,* 29 Cal.4th at p. 679.) We will examine each of the Board's express findings for evidentiary support.

## A. *The commitment offense*

■ By regulation, parole is contraindicated if the commitment offense was committed "in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (§ 2402, subd. (c)(1).)

The Board found two of these five factors, stating "most importantly, . . . the prisoner committed the offense in an especially cruel and callous manner. The offense was carried out in a dispassionate, calculated manner. The motive of the crime was inexplicable and very trivial in relationship to the offense. Because you were goaded, you wanted revenge." The Board emphasized that defendant armed himself with a rifle after an argument in a restaurant, returned to the scene, and shot the victim several times.

---

[3] Unspecified section references are to title 15 of the California Code of Regulations.

Section 2402, provides in part: "(b) . . . All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

"(c) Circumstances Tending to Show Unsuitability. . . :

"(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner . . . . [¶] . . . [¶] (2) Previous Record of Violence . . . . [¶] (3) Unstable Social History . . . . [¶] (4) Sadistic Sexual Offenses . . . . [¶] (5) Psychological Factors . . . . [¶] (6) Institutional Behavior . . . .

"(d) Circumstances Tending to Show Suitability . . . : [¶] (1) No Juvenile Record . . . . [¶] (2) Stable Social History . . . . [¶] (3) Signs of Remorse . . . . [¶] (4) Motivation for Crime . . . . [¶] (5) Battered Woman Syndrome . . . . [¶] (6) Lack of Criminal History . . . . [¶] (7) Age . . . . [¶] (8) Understanding and Plans for Future . . . . [¶] (9) Institutional Behavior . . . ."

We quote the regulations more fully where relevant to our discussion.

In the opinion of the trial court, this murder was "not . . . especially egregious when compared to other murders." Further, according to section 2403, the Board's own matrix for setting base terms once a prisoner is found suitable for parole, the fact that the victim goaded defendant placed the crime "within the midrange" of second degree murders.

In *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783], the California Supreme Court has recently determined that the Board is not required to refer to its sentencing matrices or to compare other crimes of the same type in deciding whether a prisoner is suitable for parole and whether the prisoner's crime was " 'especially . . . cruel' " or " 'exceptionally callous.' " Rather, the Board may characterize a murder as " 'particularly egregious' " if there is violence or viciousness beyond what is "minimally necessary" for a conviction. (*Id.* at p. 1095.)

■ It does not appear that the trial court made a finding whether the Board's determination regarding the nature of the commitment offense was supported by some evidence, as required by *Rosenkrantz*, *supra*, 29 Cal.4th 616. In our view, there is some evidence that this murder was especially cruel and callous. Between the initial verbal and physical confrontation with the victim outside the bar, defendant returned to the bar, left, retrieved a rifle, and returned to the bar. One of the first shots pierced the victim's mouth. As the victim bled and walked around the parking lot, defendant followed him and continued firing until defendant killed him. The initial wounding and deliberate stalking of a defenseless victim can reasonably be characterized as especially cruel and callous. (Cf. *In re Morrall* (2002) 102 Cal.App.4th 280, 301–302 [125 Cal.Rptr.2d 391] [seven shots were exceptionally callous]; *In re Smith*, *supra*, 114 Cal.App.4th at p. 368 ["Smith had an opportunity to stop his crime but continued"].)

The Attorney General asserts the existence of another atrocity indicator, namely that defendant's action "threatened the lives of others." The Attorney General claims that defendant, in fleeing, almost rammed an oncoming vehicle containing three people and he shot at them. The probation report mentioned that shots were fired from defendant's car at an oncoming vehicle.

Though a defendant's behavior after the commitment offense is relevant to parole suitability (§ 2402, subd. (b)), none of the Board's findings cited defendant's postshooting conduct and, as the trial court observed, defendant was not charged with any crime as a result of this alleged behavior. We must confine our review to the stated factors found by the Board, and all the evidence presented at the parole hearing which is relevant to those findings,

not to findings that the Attorney General now suggests the Board might have made.[4]

### B. *Defendant's criminal history*

Defendant's "past criminal history, including involvement in other criminal misconduct which is reliably documented," is relevant to his parole suitability. (§ 2402, subd. (b).) The lack of a prior record indicates parole suitability. (§ 2402, subd. (d)(6).)

The initial probation report indicated that defendant's lack of a criminal record favored a grant of probation. At the parole hearing, the Board acknowledged that defendant has no juvenile record and "only the instant offense as an adult record," but then found, without explanation, that "the prisoner has an escalating pattern of criminal conduct." The Attorney General does not suggest that there is any evidence supporting this finding and we do not see any.

### C. *Defendant's social history*

Defendant's social history is relevant to determining his parole suitability. (§ 2402, subd. (b).) Stable relationships with others favor parole (§ 2402, subd. (d)(2)), while "a history of unstable or tumultuous relationships with others" weighs against parole. (§ 2402, subd. (c)(3).)

On the general topic of defendant's social history, the Board found that defendant has "an unstable social history that includes having a very limited education." "[Y]ou had a very severe alcohol problem, and you were carrying a loaded gun as a matter of routine."[5]

Regarding defendant's alcohol problem, an August 2001 mental health evaluation by Dr. Rueschenberg, on which the Board relied, quoted defendant as saying that he began consuming alcohol at the age of 17, when he came to California. Defendant initially reported drinking a beer or two a day and a six-pack on the weekends, but further discussion revealed more extensive drinking. On the day of the murder, defendant had consumed a 40-ounce

---

[4] By the same token, we disregard evidence in the record about prison certificates that defendant had received after the Board's hearing, such as his January 2003 completion of a 44-week anger management course.

[5] Contrary to the Attorney General's suggestions, the Board did not find the commitment offense to be evidence of defendant's instability nor did the Board find defendant's "failure to acknowledge his abuse" of alcohol to be further evidence of instability.

bottle of beer, a six-pack of tall beers, and three pitchers of beer before going to the restaurant, where he continued drinking. Defendant denied to Rueschenberg having a current problem with alcohol. Defendant told the Board in March 2002 that he did not drink to get drunk, but he did get drunk on the day of the murder. Defendant said he wanted "to continue the alcoholics program in Mexico" upon his release. Though there is some evidence that defendant had an alcohol problem, there is no evidence that it contributed to "a history of unstable or tumultuous relationships." As we discuss in the following section, it appears he has attempted to address the problem in institutional programs, contrary to the Board's finding that he failed to participate in Alcoholics Anonymous (AA) or Narcotics Anonymous (NA).

There is conflicting evidence about defendant carrying a gun. At the parole hearing in March 2002, a commissioner asked defendant if he had the gun in his waistband or his car. Defendant explained that he went home to retrieve the gun. The prosecutor told the Board that defendant drove "from the scene of this restaurant a little over three miles to where he was residing on this farm." However, at an earlier parole hearing in November 1998, defendant said he might have had the gun in his car for a week, but he could not remember. He also said he had the gun at home for protection. In our view, this does not amount to some evidence that defendant carried a loaded gun "as a matter of routine."

Defendant has a limited education. Dr. Rueschenberg reported that defendant completed fourth grade in Mexico. This evaluation also reported that defendant was raised in an intact family with 14 children and that he was married for six years until his incarceration for murder. The probation report stated that defendant "is a legal alien from Mexico and has been steadily employed as a field laborer." While he has a limited education, this does not appear to have resulted in unstable relationships or violent or criminal behavior apart from the commitment offense.

In short, apart from the commitment offense, we see no evidence that defendant has an "unstable social history."

D. *Defendant's institutional behavior*

■ Defendant's postcommitment institutional behavior is relevant to his suitability for parole. (§ 2402, subd. (d)(9).) "[S]erious misconduct in prison" is a negative factor. (§ 2402, subd. (c)(6).)

The Board made the following findings regarding defendant's institutional behavior. "[Y]ou've programmed in a limited manner, you've failed to upgrade educationally or vocationally as previously recommended. You've not sufficiently participated in beneficial self-help and therapy programming. . . . [T]he prisoner still needs therapy in order to face, discuss, understand, and cope with stress in a nondestructive manner. Until progress is made, the prisoner continues to be unpredictable and a threat to others. Until he's able to understand the causative factors as well as his culpability in this particular crime. . . . The therapy in a controlled setting is needed but motivation or amenability are questionable. Nevertheless, the prisoner should be commended—you haven't gotten any 115s ever since your entire time here. You have a certificate for landscape and gardening. You have current positive work reports. However, all of these positive aspects of your behavior don't outweigh the factors of unsuitability."

In explaining why a grant of parole was unlikely in three years, the Board elaborated: "He needs additional time to gain such programming. He failed to participate in AA or NA to help him cope with understanding the criminal—his causative factors of his criminality, as well as he's failed to upgrade educationally. You have been here wasting your time, Mr. DeLuna. As long as you've been here, you could have finished ESL and have some knowledge of a second language as well as some other important skills, some other employability type of skills. You as well need some more insight into the life offense itself. This talked about part of your anger that caused you to be here."

The trial court made the following comments about these findings. "First, [defendant] has been a model inmate, having no disciplinaries and achieving a classification score of zero. Secondly, the Board issued a 'finding . . . that the prisoner still needs therapy.' Doctor Rueschenberg, however, stated in the most recent Psychosocial Assessment that there was no need for mental health services. It appears that the Board would put [defendant] in an impossible situation by demanding proof of therapy which will never be given since there is no diagnosed need. [Defendant] has consistently been rated in his doctor and counselor reports as posing only a moderate, average, or even low risk to the public if released. The Board's decision to ignore the experts and announce a contrary finding, without any evidentiary support, was arbitrary and capricious. Third, the Board's derogation of [defendant's] vocational or educational status is not evidence in support of its decision given [defendant's] vocational gardening and landscaping achievements and his job offer of farm work."

The Board's finding that defendant failed to participate in AA is contradicted by the record. A life prison evaluation report for November 2000 stated

that he "remained enrolled in Alcoholics Anonymous Program from 7/96 through 6–12–00." A postconviction progress report dated July 18, 2001, stated defendant had "[c]ontinued participation in Alcoholics Anonymous throughout this period." The Board noted these reports during the hearing.

The Board's finding that defendant needs therapy is contradicted by the record, as it was in *In re Ramirez* (2001) 94 Cal.App.4th 549, 571 [114 Cal.Rptr.2d 381], and *In re Scott* (2004) 119 Cal.App.4th 871, 896–897 [15 Cal.Rptr.3d 32]. A psychological evaluation for October 1998 stated, "He does not have a psychiatric condition which would benefit from mental health treatment." As the Board quoted during the parole hearing in March 2002, the Rueschenberg evaluation of August 2001 stated, "There do not seem to be any signs or symptoms of a mental disorder, and [defendant] does not appear to be in need of mental health services."

The Board observed that defendant had not learned English as a second language. Defendant told Doctor Rueschenberg that he has attended ESL classes on and off, but has had difficulty learning English. We agree with the trial court that this circumstance must be weighed against the likelihood of defendant's deportation to Mexico. During the hearing, the Board noted, "you have a US INS hold, you're going to be deported." Defendant explained that he intended to work for his father on the family farm in Mexico upon release. Defendant said he did not intend to return to the United States due to the INS hold. If he were not deported, he would live with his wife in Sonoma. Defendant has a job offer from a former employer as a farm worker.

The Board stated that defendant had failed to upgrade his vocational training, apparently dissatisfied with defendant's training in landscape and gardening. While there is evidence that defendant has concentrated in prison on certain vocational skills, we do not perceive any connection between his gardening skills or his inability to speak English and the Board's conclusion that "he would pose an unreasonable risk of danger to society or a threat to public safety if released from prison." Nothing in the record indicates that defendant's criminality or ability to support himself was affected by any limitation of his vocational or language skills.

The Attorney General asserts that defendant's pattern of behavior supports the Board's finding of unsuitability. Section 2402, subdivision (b) states in part: "Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." Assuming there may be some connection between defendant's limited English, limited education, and his limited vocational training, the Board did not establish how this combination or pattern makes him unsuitable as a threat to public safety.

### 3. THE BOARD'S CONCLUSIONS

This review of all of the Board's stated reasons for denying defendant a parole release date reveals that the majority of them lack any evidentiary support. Indeed, the Board made findings contrary to facts earlier acknowledged by the Board at the hearing.

■ In reviewing a decision denying parole, we first determine whether some evidence supports each of the factors stated by the Board to justify the denial of parole. (Cf. *Rosenkrantz, supra,* 29 Cal.4th 616, 677–683; *In re Smith, supra,* 114 Cal.App.4th 343, 366–373.) If one or more of the factors lacks evidentiary support, the next questions are whether the Board would have denied parole based upon the supported factors and whether this result "satisfies the requirements of due process of law" because the factors for which there is some evidence "constitute a sufficient basis supporting the . . . discretionary decision to deny parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) We will uphold the denial of parole when it appears that the Board would have reached the same conclusion based on the supported factors and those factors individually or collectively justify that conclusion. (Cf. *Id.* at pp. 677, 682–683; *In re Dannenberg, supra,* 34 Cal.4th at p. 1071.)

■ On the other hand, the "decision cannot stand" when findings on important factors lack evidentiary support and it is not clear that the Board would have reached the same conclusion based on the supported factors. (Cf. *In re Smith, supra,* 114 Cal.App.4th at p. 373.) When the supported factors could justify denying parole, but it is not clear that the Board would have reached this conclusion, we concluded in *In re Smith, supra,* 114 Cal.App.4th at pages 373–374, that the appropriate remedy is to direct the Board to reconsider the prisoner's parole suitability in accordance with the discretion allowed by law. (Cf. *In re Ramirez, supra,* 94 Cal.App.4th at p. 572; see *Rosenkrantz, supra,* 29 Cal.4th at p. 658.)[6]

Therefore, to the extent the trial court's order here remanded this case "to the Board with directions to proceed in accordance with due process," we conclude that the order was appropriate.

### 4. THE TRIAL COURT'S CONCLUSIONS

#### A. *The effect of the plea bargain*

In this case the Board notified the Santa Clara County District Attorney of the parole suitability hearing. (Pen. Code § 3042, subd. (a).) The Board

---

[6] When there is no evidentiary basis for denying parole, "the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.)

appropriately considered the district attorney's appearance and opposition to parole. (Pen. Code, § 3046, subd. (c).) The trial court's order has "precluded" the Santa Clara County District Attorney "from opposing parole based on the gravity of the commitment offense." The trial court reasoned that the prosecutor is estopped by the 1985 plea bargain agreeing to second degree murder to now argue that defendant should be incarcerated longer "than the existing matrix designation" based on the nature of the commitment offense.

We assume for the sake of discussion that a prosecutor who agrees in a plea bargain to a particular parole date should be bound by that agreement, whether actually authorized to enter it or not. (*Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, 1159–1161.) We also assume for the sake of discussion that the district attorney is a party to these habeas corpus proceedings. Nevertheless, we conclude that this part of the court's order is unauthorized as it lacks evidentiary support. We see nothing in the record indicating that the 1985 plea bargain included a promise by the prosecutor either that defendant would be released on parole at any specific time, that defendant would be released according to the regulatory matrix, or that the prosecutor would cease arguing on a given date that defendant's second degree murder was especially callous. Absent such evidence, defendant cannot establish that his continued incarceration is a breach of his bargain. The district attorney's office is not bound to honor a promise it did not make. (*People v. Dickerson* (2004) 122 Cal.App.4th 1374, 1386 [19 Cal.Rptr.3d 545].)

### B. *The Board's discretion on reconsideration*

Though it was appropriate for the trial court to remand the case to the Board for further consideration, the trial court went further and "precluded" the Board "from relying on any of the purported reasons it previously articulated as outlined above." In attempting to thus curtail the Board's exercise of discretion, the trial court has exceeded its authority. Section 2402, subdivision (b) provides in part: "All relevant, reliable information available to the panel shall be considered in determining suitability for parole." *Rosenkrantz* observed, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) The Board should proceed in this manner. If there is evidentiary support for a finding currently lacking it, the Board may make that finding again.

### DISPOSITION

The case is remanded to the trial court to modify its order granting defendant's petition for habeas corpus and remanding the matter to the Board to reconsider its decision and to conduct a new hearing to reconsider defendant's suitability for parole using, without restriction, the factors deemed appropriate by the relevant statutes and regulations and in accordance with the requirements of due process. As so modified, the order is affirmed.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

A petition for a rehearing was denied March 3, 2005, and on February 16, 2005, and March 3, 2005, the opinion was modified to read as printed above.