[No. H030203. Sixth Dist. Dec. 5, 2006.]

In re BERNARD JOHN WEIDER on Habeas Corpus.

574

## COUNSEL

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Scott M. Mather, Deputy Attorneys General, for Plaintiff and Appellant.

William L. Schmidt for Defendant and Respondent.

## OPINION

PREMO, J.—In 1987, Bernard John Weider was convicted of second degree murder (Pen. Code, § 187) and two counts of assault with a firearm (*id.*, § 245, subd. (a)(2)). He was sentenced to an indeterminate prison term of 15 years to life. Weider is now 69 years old, a model prisoner with no record of discipline while in prison and no criminal history other than the offenses for which he was incarcerated.

In 2002, the Board of Prison Terms (Board)[1] refused to set a parole date and Weider petitioned the trial court for a writ of habeas corpus. The trial court issued the writ and instructed the Board to conduct a new hearing. This court affirmed the trial court's order in an unpublished opinion filed January 10, 2005. (*In re Weider*, H027042 (*Weider I*).)[2]

On rehearing, the Board again found Weider unsuitable for parole and Weider again petitioned the trial court for a writ of habeas corpus. The trial court again granted the petition and ordered the Board to hold a further hearing, this time instructing the Board to consider only new evidence. Warden Scott P. Rawers appeals. We granted appellant's request for a writ of supersedeas, staying the order of the trial court pending our decision in this case.

---

[1] The Board of Prison Terms was abolished effective July 1, 2005, and replaced by the Board of Parole Hearings. (Pen. Code, § 5075, subd. (a).) Depending upon the context, "Board" refers to the parole agency or to the panel of three commissioners that conducted the hearing.

[2] Our recitation of some of the procedural aspects of this case is taken from the record in *Weider I*, of which we take judicial notice.

## I. Social History

Weider was born in 1937. His mother and father separated when he was young and he grew up in a stable home with his mother and maternal grandparents. Weider was in the United States Air Force from 1955 through 1959 and served in the reserves for three more years after that. He was hired by General Electric shortly after leaving the Air Force and worked there for 24 years, advancing to the position of senior software engineer. While working full time he attended night school and earned two associate degrees, one in business and one in business data processing. He has no record of any crime committed while a juvenile and no history of prior convictions other than the crimes for which he was incarcerated. He never used illegal drugs. He had smoked cigarettes occasionally and had used alcohol. Weider had been married only once, for 26 years, and there were four children of the marriage. He is closest to his eldest daughter who lives in Red Bluff, California.

## II. The Commitment Offense

The circumstances of the commitment offense were described in *Weider I*:

"On Memorial Day 1985, [Weider], then a 49-year-old engineer, and his wife of 26 years, Susan, [fn. omitted] helped her coworker of many years, George Laird, move out of his marital home in the course of separating from his wife. Susan did not come home that night, claiming to have fallen asleep on Laird's couch. The next day, she and the youngest daughter, Camille, 21, moved in with Laird.

"Almost two years later, around 3:00 p.m. on February 15, 1987, Susan and Laird, frequent patrons of the Jubilee Grill in San Jose, [fn. omitted] were at the grand reopening. About 100 persons were there. [Weider], who stopped in to get something to eat, went to Susan's and Laird's table to talk to them. He addressed Laird as 'Deacon' which upset Susan. She began yelling and told [Weider] 'everything was all [his] fault, [he] should get out of her life and get the hell out of the restaurant.' [Weider], who had made two previous unsuccessful suicide attempts, decided to shoot himself in front of her. He left the bar, went to his car, and came back with a .380-caliber automatic gun loaded with a 5-round clip in his pocket. The gun had been purchased legally and was registered, but [Weider] did not have a concealed weapons permit. [Weider] sat down behind Susan and asked 'Do we talk now or do I kill George and myself?' Laird asked Susan if she had gotten the restraining order yet. [Weider] stood up, Laird stood up, [Weider]

removed the gun from his pocket, fired twice at Laird, and missed. Laird ran to the back of the bar and Susan started wrestling with [Weider]. [Weider] had put the gun to his head and Susan pleaded with him not to shoot himself while continuing the struggle. Laird came back to the front of the restaurant, grabbed a bottle from the bar, and hit [Weider] over the head with it, shattering it. Susan stepped back, Laird grabbed for the gun, and he and [Weider] struggled over it. Patrons of the bar started to help Laird, and as [Weider] and Laird struggled on the floor, several shots were fired. Laird received two shots, one a contact wound, at 'close range' and died. Two other patrons were shot, one twice.

"Susan's departure had been 'a bolt out of the blue' which sent [Weider] into a deep depression. However, in the ensuing months, he and Susan 'developed fairly cordial relations[]' and he took her to dinner or a movie occasionally, repaired her brakes, gave her a ride to medical appointments, and shared holidays and birthday celebrations with her and their children. Suddenly, however, she stopped accepting invitations and [Weider] got more and more depressed. In January 1986, Susan responded to a dinner invitation with the disclosure that 'she never wanted to hear from [Weider] or see [him] again.' He continued to attempt reconciliation with Susan so she applied for a restraining order to stop him from bothering her. They were divorced in June 1986. The next time [Weider] saw Susan after the January 1986 conversation was in the Jubilee Grill on February 15, 1987.

"[Weider] had focused most of his anger on Laird. He felt Laird was a hypocrite based on his mistaken belief that Laird was a church deacon while at the same time committing adultery with [Weider]'s wife. At some point, [Weider] told Laird he would like to kill him.

"[Weider] also told Susan he was going to kill himself and he first attempted it on October 10, 1985. He called Susan at work to say 'farewell' before shooting himself with a rifle. However, his son came home before he could complete the act. A month or two later, he tried to hang himself with a necktie, but it hurt too much. The incident on February 15 was his third attempt.

"[Weider] had had a handgun at home, but his youngest daughter removed it because she thought he was suicidal. [Weider] bought another which he shot at a pistol range with his son. At first, he kept it at home, but then it occurred to him that his daughter might remove that one also, so he kept it in the trunk of his car with its ammunition."

### III. Procedural Background

Weider was charged with murder and two counts of assault with a firearm. Each count included an enhancement alleging that Weider had personally used a firearm in the commission of the offense. (Pen. Code, § 12022.5.) The prosecutor stipulated that the murder charge was for second degree murder and offered to support a sentence of 15 years to life if Weider would plead to the crimes as charged. Accordingly, Weider entered guilty or no-contest pleas to the three counts and was sentenced to prison for 15 years to life. The court did not impose additional time for the enhancements.

Weider's minimum eligible parole date was February 15, 1997. His initial parole consideration hearing was held on May 8, 1996; parole was denied. He stipulated to a two-year denial in lieu of a second hearing on November 10, 1999. His third scheduled hearing was held on May 13, 2002.

### A. The 2002 Hearing

At the 2002 hearing the evidence showed that Weider had a virtually unblemished record of good behavior while in prison, having received only two form-128-A counseling "chronos," the last in 1992.[3] He had participated in vocational training and in stress reduction, anger management, and conflict resolution groups. The examining psychologist reported that "psychological factors are not involved or are not present" and that Weider "would be a low risk" if paroled. The Board noted that Weider had supportive family in the last county of legal residence and elsewhere in California, that he was of retirement age, and that he had sufficient pension and Social Security income to support himself.

In spite of the fact that there was evidence to support every relevant suitability factor listed in the Board's regulations, the Board found Weider unsuitable for parole based upon its finding that "[t]he commitment offense was carried out in an especially cruel and callous manner. Multiple victims were attacked, injured, and killed in the same incident. The incident was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering." The Board also noted that "the prisoner does need continued self-help and therapy programming in order to face, discuss, understand the causative factors that led to this life crime and to explore his culpability into this life crime. Until progress is made, he continues to be unpredictable and a threat to others." The Board noted that the Santa Clara County District Attorney and Laird's next of kin opposed a finding of suitability.

---

[3] Form 128-A, a "Custodial Counseling Chrono" documents an incident of minor inmate misconduct and the counseling provided. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(2).)

Immediately following the reading of the decision Deputy Commissioner Mackenberg commented, "I'm not going to ask you to do any more therapy. The long and short of it is I'm not sure you can find it in this place at this time, but I'd like to see you finish off that drafting thing" because it would be "a good intellectual exercise." Presiding Commissioner Bordonaro added, "I don't know if therapy is in order, but I believe that if you can get into one of Dr. Tolsen's groups, one of the lifer's groups, one of the process groups he has, I think it would help—be helpful to you. Maybe just to be able to help express your emotions and what you're feeling."

Weider petitioned the trial court for a writ of habeas corpus arguing that the Board's refusal to set a fixed parole date was a denial of due process. The trial court concluded that there was no evidentiary support for the finding that Weider needed further self-help programming and no support for the conclusion that the commitment offense was carried out in a manner that demonstrated an exceptionally callous disregard for human suffering. The court did find evidence that multiple victims had been injured or killed. The court issued the writ and ordered the Board to hold a new hearing and not to "merely recite form language" in support of its conclusion but to "point to some evidentiary support and factors for which the Board can articulate the reasons for its characterizations." The *Weider I* appeal followed.

### B. The Weider I *Holding*

*Weider I* concluded that there was no evidence the crime was committed in a manner that showed callous disregard for human suffering and no evidence that Weider needed further therapy. *Weider I* agreed that there was evidence that multiple victims had been injured or killed but that the facts were not so different from ordinary second degree murders as to make the crime especially heinous, atrocious or cruel and, therefore, the trial court did not err in returning the matter to the Board for a new hearing.

### C. The 2004 Hearing

While the *Weider I* appeal was pending, the Board held another parole consideration hearing on May 4, 2004, and again concluded that Weider was not suitable for parole. The Board again cited the circumstances of the commitment offense and the need for self-help programming but this time the Board noted that Weider needed to participate in a substance abuse program. The Board observed that in the report prepared for the 2002 hearing, Dr. Joe Livingston had expressed some concern that Weider has "downplayed the

role that his alcohol consumption had in marital and family problems as well as the tragic culminary [sic] event." Livingston opined: "Parole conditions most certainly should include substance abuse counseling, random drug testing, and self-help group attendance."

Livingston had interviewed Weider's daughter, Dawn, who reported that she felt her mother was a contributing factor in the crime in that she taunted Weider and went out of her way to make him angry. "In regards to her father's alcoholic consumption she stated that she was concerned about his drinking her whole life. She described him as a functional drunk. For example, he could go to work but would often stop off at the bar with friends on the way home. She stated that when he drank he had an ugly mouth, mostly over mom, quote/unquote."

The Board told Weider, "[W]e want you to specifically address that issue with some attendance of substance abuse types of self-help groups. And in the psych report that we'll be ordering will specifically ask for that."

Weider did not seek relief from the results of this hearing because *Weider I* was still pending when the hearing was held.

### D. The 2005 Hearing

### 1. Evidence

Following issuance of our opinion in *Weider I*, the Board held yet another hearing on March 14, 2005. The Board began the hearing by reading into the record the factual statement from *Weider I*. Weider stipulated that his version of the facts was as set forth in the appellate opinion.

The Board then reviewed Weider's social history and his record while in prison, noting that he "has remained disciplinary-free." He had taken a small business and light industry course for which he received a grade of "A." He also completed data processing and mechanical drawing courses, receiving grades of "A-plus" in both. He works as a porter in the prison. He has participated in a personal growth seminar. Weider admitted that he had not attended any substance abuse programs. He did not feel he needed them. He had not had a drink in the 18 years he had been in prison, even though alcohol is often available. He stated that he did not think he was an alcoholic, "although I enjoy drinking with friends."

The Board referred to Livingston's 2002 report: "Dr. Livingston states here that you began drinking alcohol when you were in the Air Force, and you

enjoyed drinking alcohol. It says that you were only intoxicated two times, and that he would always pace himself when he drank so that he would not become intoxicated. [¶] 'He reports that during those two times of intoxication he did experience blackout. He denies ever being violent while using alcohol or drugs or having any type of treatment for alcohol use. He indicates that his father was a heavy drinker and likely an alcoholic.' [¶] But then he states that, 'When asked if he was intoxicated at the time, he stated that he only had one sip of beer prior to the crime.' And when he asked who or what is blamed for the offense, he responded, regardless of my intentions, I should not have brought the firearm into a bar." There is no dispute that Weider was not under the influence of alcohol at the time of the offense.

Back in 2002 Livingston had administered three psychological tests to evaluate Weider's risk for future violence. The possible scores in each test were: low, moderate, or high. Weider scored "low" in each one. Livingston's conclusion was that Weider's scores indicated a low level of risk for future violence. The Board again recited Livingston's concern that Weider had "downplayed" the role alcohol played in his marital problems "as well as the tragic culminating event" and his opinion that parole conditions should include "substance abuse counseling, random drug testing, and self-help group attendance." Although the Board had indicated in 2004 that it would be ordering an updated psychological report to focus on the substance abuse issue, no such report was mentioned during the hearing and none appears in the record.

A private psychological report dated February 21, 2005, was prepared by Dr. Melvin Macomber at Weider's expense. Macomber interviewed Weider and administered four psychological tests, including the "Substance Abuse Subtle Screening Inventory." Macomber concluded: "Mr. Weider poses no more risk to society than the average citizen. This conclusion is based upon the consideration of several factors which are listed below: Mr. Weider is not criminally oriented. Mr. Weider has never been in trouble with the law prior to commitment. Mr. Weider has an excellent institutional behavior. Current testing shows that Mr. Weider does not have a substance abuse dependence problem. He admits that he did drink too much prior to the commitment offense, but this was not a problem that was out of control. Mr. Wieder does have monthly support. He has a savings account and [S]ocial [S]ecurity. Mr. Weider's health is deteriorating. He's 67. Mr. Wieder has the support of his children in the community." The report concluded: "At this point in time, there are no risk factors in this case. Alcohol and drug abuse are not risk factors in this case. The use of alcohol may have attributed [*sic*] to Mr. Weider's marital problems, but it did not contribute to the commitment offense itself."

The "Life Prisoner Evaluation Report," dated May 2004, concluded that Weider had satisfactory post-release plans and a circle of family and friends outside of prison for support. The report stated that the seriousness of the crime could not be overemphasized. "Today, however, Weider appears to be a low risk to society if he were released from prison. Since his incarceration Weider has been a model prisoner by remaining disciplinary free, upgrading himself educationally and vocationally, has the lowest custody allowed to Lifers, and has participated in self-help/group therapy." The report went on to note that Weider could benefit from further participation in self-help/group therapy prior to release and, since he was drinking alcohol at the time he committed the offense, "he may benefit from attending Alcoholics Anonymous (AA) meetings."

Weider explained that his plans for parole were to move to Redding if he were allowed so that he could be near his daughter in Red Bluff. He has a pension of about $1,000 per month and Social Security of about $1,500 per month in addition to his savings. He has a son in Santa Clara County who submitted a letter stating that his family would "provide him with a loving and stable home and help him to transition back into society." Weider also apologized to Laird's family, stating, "I am very, very sorry for the life taken from your father and accept full responsibility for my action."

## 2. Findings

The Board again concluded that Weider was unsuitable for parole. The Board found that "[t]he offense was carried out in a dispassionate and calculated manner. And we [find] it was dispassionate and calculated because [Weider] took a weapon into a bar, into a public place. So it was calculated. The offense was carried out in a manner that showed a callous disregard, if nothing else, for your community. The mere fact that you would go into a bar with a weapon—armed with a weapon and to pull the weapon out and to discharge it in a public forum shows that you had a lack of respect at the time for your community, not to mention the people that was [sic] involved in the incident. . . . [T]here was [sic] additional individuals in the bar that received wounds. The prisoner had no escalating pattern of criminal conduct. In fact, the prisoner has no prior criminal history (inaudible). The prisoner's programming has been basically pretty good. The prisoner has programmed. However, he have not [sic] sufficiently participated in self-help programs, substance abuse programs . . . most notably. . . . Most recent psychological evaluation that we considered was the one by Dr. Joe Livingston. It was completed on . . . 2/26/02." The decision quotes the section of the Livingston report that refers to the concern Weider has "downplayed" the role of alcohol

and the recommendation that parole conditions include substance abuse counseling. The decision goes on: "The Panel feels that the prisoner needs to continue to involve himself in positive kinds of programs, especially substance abuse programs, and other kinds of programs that would enable him to be able to face, discuss, understand, and cope with stressful situations in a nondestructive manner." The Board noted that the deputy district attorney from Santa Clara County and the victim's children had appeared at the hearing and had spoken in opposition to Weider's release.

On the side of suitability the Board noted that Weider has a place to live and retirement income to take care of himself once released. He had a "spotless disciplinary-free record" in prison and "[h]is work reports all seem to be very good, positive work reports. All of those kinds of things indicate that the prisoner's adjustment has been satisfactory. Nevertheless, those positive aspects of his behavior does not [sic] outweigh the factors of unsuitability." Parole was denied for one year and Weider was instructed to remain free of disciplinary problems, to participate in a program that deals with substance abuse, and to prepare to participate in such a program once he is released.

### 3. The Trial Court's Ruling

The trial court granted Weider's petition for relief from the 2005 decision and, as before, remanded the matter to the Board for another hearing. The court concluded that the only factor supported by the evidence was the multiple victim factor but that this did not justify the denial of parole. "The multiple victim fact does not amount to even 'some evidence' weighing against [suitability] because it is undisputable that the bystanders were not intentionally injured. The exact same stress which built up and culminated in the murder led to the injuries of the bystanders. Petitioner unexpectedly encountered the source of his emotional stress and despair in a public place and that is where his breakdown and crime occurred. It is untenable to argue that Petitioner's accidental injuring of bystanders shows parole unsuitability when, under the statutory criteria, the intentional murder does not."

The court noted that Weider "has served so much time that, with custody credits, he is within the matrix for first degree murder . . . . [I]t should be self evident that after an inmate has served the equivalent of 25 years, whether his actions were more than minimally necessary for a second degree conviction . . . is no longer the appropriate question. [The Board's] position, that inmates who were only convicted of second degree may forever be denied parole based on some modicum of evidence that their acts rose to the level of a first, without acknowledging the fact that they have already served the time

for a first, should be seen as so ridiculous that simply to state it is to refute it."

The court granted the petition and ordered the Board to hold a new hearing, specifically instructing the Board to consider only new evidence that had not previously been presented.

## IV. Contentions on Appeal

Appellant contends that the trial court erred in reversing the Board's decision because the Board had applied the appropriate criteria and its decision that Weider is unsuitable for parole is supported by some evidence. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

Appellant challenges the trial court's decision for the additional reason that the court failed to consider the Board's determination that Weider needed further self-help and therapy programs before a parole date could be set.

Appellant also contends that even if we find no error in the trial court's assessment of the evidentiary support for the Board's decision, the court erred in precluding the Board from considering all relevant evidence at the further hearing.

## V. The Statutory Framework and Judicial Review

### A. *Parole Release Guidelines*

Parole considerations applicable to life prisoners convicted of murder are contained in title 15 of the California Code of Regulations, section 2400 et seq.[4] According to the regulations, before setting a parole date, the panel "shall first determine whether the life prisoner is suitable for release on parole." (§ 2402, subd. (a).) In determining whether the prisoner is suitable for parole, the Board considers circumstances tending to show unsuitability and circumstances tending to show suitability.

Circumstances tending to show unsuitability include that the inmate: "(1) . . . committed the offense in an especially heinous, atrocious or cruel manner." (§ 2402, subd. (c)(1).) In deciding whether the crime was particularly heinous, atrocious, or cruel the Board is to consider the following

---

[4] Hereafter, all undesignated section references and all further references to regulations are to title 15 of the California Code of Regulations.

factors: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." (*Ibid.*)

■ Other circumstances tending to indicate unsuitability for parole are that the inmate possesses a previous record of violence, has an unstable social history, has previously sexually assaulted another individual in a sadistic manner, has a lengthy history of severe mental problems related to the offense, and has engaged in serious misconduct while in prison. (§ 2402, subd. (c).)

■ Circumstances tending to show suitability for parole are that the inmate has no juvenile record, a stable social history, has shown signs of remorse, "committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time" (§ 2402, subd. (d)(4)), committed the offense as a result of battered woman syndrome, lacks any significant history of violent crime, is of an age that reduces the probability of recidivism, has made realistic plans for release, and has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (*Id.*, subd. (d).)

■ The specified unsuitability and suitability factors are "general guidelines" only. (§ 2402, subds. (c), (d).) The Board is expected to consider "[a]ll relevant, reliable information available . . . . Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (*Id.*, subd. (b).) "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (*Id.*, subd. (a).)

### B. Judicial Review of Board Parole Decisions

■ In *Rosenkrantz, supra*, 29 Cal.4th 616 at page 655, the Supreme Court explained that parole release decisions "entail the Board's attempt to predict by subjective analysis whether the inmate will be able to live in society without committing additional antisocial acts." Such a prediction requires analysis of individualized factors on a case-by-case basis and the Board's discretion in that regard is " ' "almost unlimited." ' " (*Ibid.*) Although the Board's discretion is exceedingly broad, it is circumscribed by the

requirements of procedural due process. (*Ibid.*; Cal. Const., art. I, § 7, subd. (a).)

Given the broad discretion granted the Board, judicial review of the Board's parole decisions is very limited. "[T]he court may inquire only whether *some evidence* in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658, italics added.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the [Board] . . . [T]he precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the [Board], but the decision must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious. It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the [Board's] decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the [Board's] decision." (*Id.* at p. 677.) Even if some of the Board's reasons for denial are not supported by the evidence, so long as the reasons that are supported by some evidence constitute a sufficient basis for the Board's decision, the decision satisfies the requirements of due process. "Because the trial court's findings were based solely upon documentary evidence, we independently review the record." (*Ibid.*)

VI. DISCUSSION

A. *The Need for Further Self-help Programs*

We first dispose of appellant's contention that the Board's finding that Weider needed to participate in substance abuse programs is supported by the evidence. It is undisputed that Weider had no prior history of violent or reckless behavior related to the use of alcohol. He was not under the influence at the time of the crime. And he has not had a drink in the 18 years he has been incarcerated. The sole basis for the Board's finding is a three-year-old psychological evaluation that indicated that Weider may have "downplayed" the role of alcohol in his marital problems "as well as the tragic culminating event." But the same report found Weider to be a low risk for future violence and merely recommended substance abuse programs as a parole condition. The report did not suggest that Weider's prior use of alcohol meant he posed an unreasonable risk of danger to society of released on parole.

It is difficult to credit the Board's concern about the alcohol issue since that concern did not arise until the 2004 hearing, after the trial court rejected the Board's 2002 parole denial. For the first 17 years Weider was incarcerated the matter was never mentioned. And, although the Board had indicated in 2004 that it would be ordering an updated psychological report to focus on the substance abuse issue, no such report was available at the hearing. Indeed, the report Weider obtained privately found that alcohol was not a risk factor. Even recognizing that the Board was free to reject that report, there is no evidence to conflict with it. The updated life prisoner evaluation merely suggested that Weider "may benefit from attending [AA]." We conclude that there is no evidence to support a finding that Weider's failure to participate in a substance abuse program while in prison makes him unsuitable for release on parole.

### B. The Nature of the Commitment Offense[5]

The only remaining factual basis for the Board's 2005 decision is its conclusion that the commitment offense was carried out in an especially cruel and callous manner in that there were multiple victims, the crime was carried out in a "dispassionate and calculated manner," and "showed a callous disregard, if nothing else, for your community." (§ 2402, subd. (c)(1)(A), (B), (D).)

### 1. The *Dannenberg* Analysis

*Dannenberg* concerned the question of how the Board may use the gravity of the inmate's offense in determining that a prisoner with a life sentence is unsuitable for parole. (*Dannenberg, supra,* 34 Cal.4th at p. 1069.) The issue was whether the Board may refuse a parole date based upon the gravity of the offense "only after evaluating the offender's crime against others of similar gravity and against its own uniform-term 'matrices,' and concluding that the offense is particularly egregious by those comparative standards, or whether it need conduct such a comparative analysis only after it determines that the inmate is suitable for parole." (*Ibid.*) *Dannenberg* concluded that the unsuitability determination is made first, on an individualized basis, and not by comparison to the Board's uniform terms. (*Id.* at p. 1098.)

---

[5] Weider argues that, pursuant to the doctrines of res judicata and collateral estoppel, *Weider I* precludes relitigation of the question of whether the commitment offense was sufficiently egregious to deny parole. The application of these doctrines to judicial review of parole matters is a question that was left open by the Supreme Court in *Rosenkrantz, supra,* 29 Cal.4th at page 668, footnote 15. Appellant recognizes that *Weider I* held that the commitment offense was not, by itself, sufficiently egregious to deny parole, but he counters that *Weider I* was based upon an analysis that has since been rejected by *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*). Because our analysis, undertaken in light of *Dannenberg*, reaches the same result we reached in *Weider I*, we find it unnecessary to consider the res judicata question.

■ *Dannenberg* clarified that, in finding an inmate unsuitable for parole, the Board may rely solely upon the circumstances of the crime. (*Dannenberg, supra,* 34 Cal.4th at p. 1080.) *Dannenberg* recognized, however, that reliance upon the circumstances of the prisoner's offense alone might contravene the inmate's constitutionally protected expectation of parole. Quoting *Rosenkrantz, supra,* 29 Cal.4th at page 683, the court explained: "[S]uch a violation could occur, 'for example[,] where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense.' [Citation.] . . . [I]n order to prevent the parole authority's case-by-case suitability determinations from swallowing the rule that parole should 'normally' be granted, an offense must be 'particularly egregious' to justify the denial of parole." (*Dannenberg, supra,* 34 Cal.4th at pp. 1094–1095.) *Dannenberg* stated that the court's "use of the phrase 'particularly egregious,' conveyed only that the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him* of the offense for which he is confined." (*Id.* at p. 1095.)

■ Weider was convicted and sentenced to the life term for second degree murder. "Second degree murder is defined as the unlawful killing of a human being *with malice aforethought*." (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 102 [13 Cal.Rptr.2d 864, 840 P.2d 969].) Malice itself involves " 'an element of viciousness—an extreme indifference to the value of human life.' " (*People v. Summers* (1983) 147 Cal.App.3d 180, 184 [195 Cal.Rptr. 21].) Thus, all second degree murders will involve some amount of viciousness or callousness. (Cf. *In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655].) Thus, a threshold consideration is whether Weider's crime was more violent or vicious than minimally necessary to convict him of killing with malice aforethought.

### 2. Analysis of the Board's Findings

■ We first note that appellant rightly does not attempt to justify the Board's finding that the crime was committed in a manner that showed a callous disregard or lack of respect for the "community." The standard is whether the crime was committed in a manner that showed exceptionally callous disregard for human *suffering*. (§ 2402, subd. (c)(1)(D).) There is no evidence of that here.

■ The Board's finding that the crime was "dispassionate" and "calculated" does not conform to the appropriate standard, either. The finding was based upon evidence that Weider "took a weapon into a bar, into a public

place." But in deciding whether the crime was particularly heinous, atrocious, or cruel, the Board is to consider whether "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder." (§ 2402, subd. (c)(1)(B).) The murder the Board describes is not at all like an execution-style murder. The fatal wound was delivered during the struggle over the gun. And there was no evidence that Weider conducted himself dispassionately. To the contrary, the evidence shows that he was angry or distraught.

 Appellant argues that the evidence that Weider went out to his truck and returned with a gun is evidence of premeditation and, therefore, "there is some evidence that Weider's crime exceeded the minimum elements necessary to sustain a second degree murder conviction." We do not read *Dannenberg* as holding that a parole denial comports with due process so long as the circumstances of the commitment offense include something more than the bare minimum necessary to prove the elements of the crime. The nature of human activity is such that, given its subjective assessment, the Board could always find some aspect of the crime that exceeds the minimum elements. Rather, an unsuitability determination must be predicated on "some evidence that the particular circumstances of [the prisoner's] crime— circumstances beyond the minimum elements of his conviction—indicated exceptional callousness and cruelty with trivial provocation, and thus suggested he remains a danger to public safety." (*Dannenberg, supra*, 34 Cal.4th at p. 1098.)

The cases are rife with examples of exceptional callousness and cruelty. *Rosenkrantz* considered the element of premeditation where the prisoner had been convicted of second degree murder. The evidence showed " 'a full week of careful preparation, rehearsal and execution,' " and that the prisoner, who "fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement," carried out the crime with "planning, sophistication, or professionalism." (*Rosenkrantz, supra*, 29 Cal.4th at p. 678.) Similarly, there was evidence of premeditation in *In re Lowe* (2005) 130 Cal.App.4th 1405 [31 Cal.Rptr.3d 1], which also involved a second degree murder conviction. There the prisoner purchased the gun shortly before the murder, entered his victim's bedroom in the middle of the night while he was asleep, unsuspecting, and in a special relationship of confidence and trust with his killer, " 'shot him five times in the head and chest, execution style.' " (*Id.* at p. 1414.) As this court stated, this evidence showed the murder " 'was a cold-blooded execution' " and that the prisoner's " 'egregious acts [were] far more aggravated than the minimum necessary to sustain a second degree murder conviction.' " (*Id.* at p. 1415.) In *In re DeLuna* (2005) 126 Cal.App.4th 585 [24 Cal.Rptr.3d 643], the prisoner, convicted of

second degree murder, had a physical confrontation with the victim in a bar, left the bar, retrieved a rifle, shot the victim in the mouth and, as the victim bled and walked around the parking lot, followed him and continued firing until he died. This court determined that "[t]he initial wounding and deliberate stalking of a defenseless victim can reasonably be characterized as especially cruel and callous." (*Id.* at p. 593.)

Each of the foregoing cases upheld a parole denial based upon circumstances that were more egregious than necessary for a second degree murder conviction. But the circumstances in those cases—rehearsing the murder, executing of a sleeping victim, stalking—reflect behavior that reasonably suggests that the inmate could present a danger if released. That is, these cases implicitly acknowledge that the overarching consideration in the suitability determination is whether the inmate is currently a threat to public safety. (*Dannenberg, supra*, 34 Cal.4th at pp. 1071, 1083, 1085–1086; *In re Scott* (2005) 133 Cal.App.4th 573, 591 [34 Cal.Rptr.3d 905].) Weider's act of simply going out to his car to retrieve the murder weapon does not reflect the type of heinous, atrocious, or cruel behavior described in the foregoing cases and does not rationally indicate that he will present an unreasonable public safety risk if released from prison. (See *In re Scott, supra*, 133 Cal.App.4th at pp. 594–595.)

Appellant points out that there is also evidence that multiple victims were injured. (§ 2402, subd. (c)(1)(A).) True, but again, the question is whether that evidence supports a finding that the crime was more violent or vicious than minimally required suggesting that Weider would be a public safety risk if released. (*Dannenberg, supra*, 34 Cal.4th at p. 1098.) The existence of multiple victims in this case is the inadvertent result of Weider's perpetrating the crime in a restaurant during business hours. As we held in *Weider I*, the fact that there were multiple victims, which will never change, cannot be sufficient to deny parole to Weider forever. " 'The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted." (*Rosenkrantz, supra*, 29 Cal.4th at p. 683.) The evidence that two additional victims were injured shows that the crime was callous and showed Weider's indifference to human life when he fired the gun in the restaurant. But this does not make the murder of Laird so excessively violent or vicious that it suggests Weider remains a public safety risk.

We note, too, that the Board failed to acknowledge that the crime was the result of significant stress in Weider's life—stress that had built up over a long period of time. This is a circumstance tending to show that Weider is

suitable for release. (§ 2402, subd. (d)(4).) The factor was mentioned during the hearing but it is nowhere mentioned in the Board's decision. The regulation requiring the Board to consider the role that such stress may have played in the commission of the crime reflects the law's awareness of human nature. Weider's crime was the result of his wife's using him to help Laird set up her and Laird's postmarital home, her infidelity with Laird, her taunts, and even her verbal assault in the restaurant on the day of the crime. We recognize that weighing the evidence is for the Board. But it is does not appear that the Board considered this evidence at all. This it is bound to do. (*Id.*, subd. (d); cf. *In re Scott, supra,* 133 Cal.App.4th 573, 596.)

### C. Opposition by the District Attorney and the Victim's Next of Kin

We are not unmindful that both the district attorney and the victim's grown children vigorously opposed a finding of suitability and that the Board is bound to consider that opposition in reaching its decision. (Pen. Code, §§ 3042, 3043.) The district attorney's argument and the family's statements undoubtedly influence the Board with respect to the weight it gives to evidence of unsuitability. That is part of the reason why this court is bound to tread so carefully and leave the Board's decision undisturbed when there is just a modicum of evidence to support it. But the opposition cannot add weight where there is no evidence of unsuitability to place in the balance. The record before the Board in 2005 contains no evidence upon which to find Weider is unsuitable for release on parole on the grounds relied upon by the Board. We must conclude, therefore, that the trial court did not err in ordering the Board to hold a new hearing.

### D. The Trial Court's Instruction to Consider Only New Evidence

Given our assessment of the record, the parties agree that it was appropriate for the trial court to order the Board to hold another hearing and to proceed according to due process. However, the trial court also instructed that the Board " 'may not find [Weider] unsuitable for parole based on the same evidence and findings articulated at the [previous] hearing, [however] if new evidence is presented different from the evidence presented at the [previous] hearing, the [Board] may consider [Weider]'s suitability considering that new evidence, if any.' " To the extent this part of the order precludes the Board from considering "[a]ll relevant, reliable information" (§ 2402, subd. (b)), the court exceeded its jurisdiction. (*In re DeLuna, supra,* 126 Cal.App.4th 585, 599.)

## VII. Disposition

The second to last paragraph on page 6 of the trial court's order of May 19, 2006, commencing with "Turning now to the remedy" is stricken in its entirety. As modified, the order granting Weider's petition for writ of habeas corpus and directing the Board of Parole Hearings to "conduct a new hearing 30 days after receipt of this order by the Attorney General," is affirmed.

The writ of supersedeas staying the order of the trial court shall dissolve upon issuance of the remittitur. The time within which the Board of Parole Hearings must hold a new hearing shall commence upon dissolution of the stay.

Rushing, P. J., and Elia, J., concurred.