[No. H030822. Sixth Dist. Oct. 3, 2007.]

In re DANIEL FREDRICK BETTENCOURT on Habeas Corpus.

COUNSEL

Heather MacKay, under appointment by the Court of Appeal, for Petitioner Daniel Fredrick Bettencourt.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Denise A. Yates, Deputy Attorneys General, for Respondent The People.

OPINION

BAMATTRE-MANOUKIAN, Acting P. J.—

## I. INTRODUCTION

Petitioner Daniel Fredrick Bettencourt pleaded guilty to second degree murder (Pen. Code, § 187)[1] in 1981 and is presently serving a sentence of 15 years to life in California State Prison, Solano. After a hearing held on July 24, 2002, the Board of Prison Terms (now the Board of Parole Hearings; hereafter Board)[2] found that Bettencourt was unsuitable for parole because he posed an unreasonable risk of danger to society or a threat to public safety if released from prison.

Bettencourt challenged the Board's decision to deny parole by filing a petition for writ of habeas corpus in the superior court, which issued an order to show cause requiring the Attorney General to address issues not raised in the habeas corpus petition. The Board petitioned this court for writ relief and we issued a peremptory writ of mandate vacating the order to show cause. (*Board of Prison Terms v. Superior Court* (2005) 130 Cal.App.4th 1212, 1244 [31 Cal.Rptr.3d 70].)

After the superior court issued a new order to show cause, Bettencourt filed two supplemental habeas corpus petitions and the superior court issued a second order to show cause. No return to either order to show cause was filed and the superior court consequently found the Attorney General to be in default. The superior court then ordered the Board to conduct a new hearing, finding that the Board had erred in relying upon the commitment offense to deny parole and directing the Board to properly weigh the parole suitability factors.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Effective July 1, 2005, the Board of Parole Hearings replaced the Board of Prison Terms. (§§ 5075, 5075.1; Gov. Code, § 12838.4.)

On appeal, the warden contends that the superior court's order should be reversed because (1) some evidence supports the Board's decision to deny parole; (2) the order unlawfully restricts the Board's exercise of its discretion in determining Bettencourt's suitability for parole; and (3) the habeas corpus petition was untimely filed. For reasons that we will explain, we find that some evidence supports the Board's decision and therefore we will uphold the Board's decision and reverse the superior court's order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Social History*

Bettencourt was born on September 24, 1962. His father and mother were in a brief relationship and did not marry. When Bettencourt was two years old, his mother married another man. She had two children during the marriage, Bettencourt's stepsister and stepbrother. Bettencourt's mother sent him to a psychologist when he was seven years old because he would "go places" and then lie to his parents or not tell them where he had gone.

When he became a teenager, Bettencourt began to associate with older youths and biker gangs and to act out in antisocial ways. He also drank alcohol and used drugs, including marijuana and cocaine. Bettencourt's parents were concerned when he became involved with Shelly Ruffner, a "neighbor girl" who was three years older than him. However, Bettencourt was also active in sports, maintained good academic standing, and graduated from high school in 1980.

Bettencourt married Shelly Ruffner in 1984 while he was an inmate at San Quentin. None of his family members have been incarcerated or had legal problems.

### B. *Criminal History*

Bettencourt's criminal history prior to the commitment offense includes a record of juvenile offenses, including burglary, auto theft, and joyriding in his parents' car. He was arrested seven times and eventually sent to the Santa Clara boy's ranch. Two additional offenses were committed after Bettencourt became an adult (apparently during the six-month period between Bettencourt's 18th birthday and the date of the commitment offense), including failure to pay a fine and violation of promise to appear (Veh. Code, § 40508, subd. (b)).

## C. *The Commitment Offense*

The commitment offense occurred on April 8, 1981, when Bettencourt was 18 years old. Bettencourt's relationship with his neighbor, Shelly Ruffner, was on and off and she had become the girlfriend of the victim, Mark Jones. Immediately before the commitment offense, however, Bettencourt and Ruffner had renewed their relationship and wanted to live together. Bettencourt decided to tell Jones that Ruffner wanted to break up with him and she was now Bettencourt's girlfriend.

Bettencourt's friend, Douglas Collier, went with him to confront Jones because Jones associated with Hell's Angels and Bettencourt was afraid there might be trouble. After Bettencourt and Collier arrived at Jones's apartment, the discussion about Ruffner erupted into a fight. Bettencourt got Jones on the floor and hit him in the face until he lost consciousness. According to Bettencourt, Jones then recovered consciousness and threatened to kill him and Collier. Bettencourt further recalls that Jones got up and ran into his bedroom, where Bettencourt feared that he had a gun. Bettencourt tackled Jones and, as the two were fighting on the floor, Collier began stabbing Jones in the back, arm, and shoulder with a screwdriver.

Bettencourt continued to hit Jones while Collier left and returned with a kitchen knife. Collier then stabbed Jones several times in the chest. When Bettencourt and Collier were certain that Jones was dead, they straightened the furniture in the apartment and attempted to clean up the blood. Bettencourt wanted to hide the body because he was afraid of going to the gas chamber if he was convicted of murder. He and Collier wrapped Jones's body in a bedspread, put it in Collier's pickup truck, and drove to the south San Jose area where they dumped the body over a cliff.

According to the probation report, Bettencourt subsequently told his cell-mate in county jail that he held Jones down while Collier was stabbing him and he was intending to fabricate a self-defense story.

## D. *Conduct While Incarcerated*

The December 2000 life prisoner evaluation report states that Bettencourt "has had a lengthy disciplinary history." On October 29, 1982, Bettencourt

received a CDC 115[3] report for control of an inmate-manufactured stabbing weapon. Bettencourt was convicted of the charge in San Joaquin County Superior Court and received a sentence of 16 months, to be served concurrently with his life term.

Bettencourt subsequently received 10 additional CDC 115 reports, for refusing to exit the yard in 1982, possession of marijuana and United States currency in 1984, possession of United States currency in 1988, disobeying orders in 1989, reckless driving of a forklift in 1992, possession of libelous material at a job assignment in 1994, sexual misconduct in the visiting room in 1994, possession of contraband in 1997, and unacceptable sexual behavior in the visiting room in 1998. Bettencourt did not receive any prison disciplinary reports between 1998 and the July 24, 2002, parole hearing.

While in prison, Bettencourt has participated in the vocational electronic data processing program. He has also been employed as a payroll clerk in the furniture factory, as a Printer II in prison industries, and in the bookbindery. From time to time he has participated in Alcoholics Anonymous and Narcotics Anonymous.

## E. *Psychological and Life Prisoner Evaluations*

The December 2000 life prisoner evaluation report concluded that Bettencourt would "pose a moderate degree of threat to the public at this time, if released from prison," due to the nature of the commitment offense, his prior record, and his prison adjustment. The report also recommended that Bettencourt establish a "disciplinary-free" record, attend self-help programs, and attend vocational programs.

In his 2001 psychosocial evaluation, Stephen Donoviel, Ph.D., provided a diagnosis of "Personality Disorder, Not Otherwise Specified, with Narcissistic, Negativistic and Antisocial traits and features." Dr. Donoviel concluded that "[i]n view of Mr. Bettencourt's adjustment over the past several years, it is evident that his risk of violent acting out is markedly reduced. His character make-up is such that if he is able to attain the recognition he needs in a positive fashion and there are no significant threats to his narcissistic ego, the risk of future violent behavior is no greater than for others in society." Dr. Donoviel also recommended that Bettencourt be involved in individual psychotherapy to "assist him in understanding and developing better ways to handl[e] his dependency needs . . . ."

---

[3] "According to the California Code of Regulations, a CDC 115 documents misconduct believed to be a violation of law which is not minor in nature. A form 128 documents incidents of minor misconduct. (See [Cal. Code Regs., tit. 15,] § 3312, subd. (a)(2) & (3).)" (*In re Gray* (2007) 151 Cal.App.4th 379, 389 [59 Cal.Rptr.3d 724].)

Charles Taylor, Ph.D., interviewed Bettencourt on January 30, 2001, and subsequently reported in his psychosocial evaluation that Bettencourt seemed "to have some lack of impulse control with regard to physical contact in the waiting room and infrequent use of marijuana." Dr. Taylor noted that only two of Bettencourt's CDC 115 reports involved "initiated violence," but he did not provide any prediction of future dangerousness.

### F. *The Board Hearing and Decision*

On July 24, 2002, Bettencourt appeared before the Board on a subsequent parole consideration hearing. The Board advised Bettencourt that it would consider the commitment offense, his criminal history, his social history, his behavior and "programming" since he was committed, any new psychiatric reports, and any other information that would have a bearing on his suitability for parole. The Board also stated that it had reviewed Bettencourt's file and prior transcripts. During the hearing, the Board additionally considered Bettencourt's parole plans and heard Bettencourt's testimony, argument from counsel, and victim impact statements.

Bettencourt's attorney contended that he was suitable for parole, while the district attorney opposed parole on the ground that Bettencourt posed a danger to the community and needed to participate further in Alcoholics Anonymous and Narcotics Anonymous and perhaps undergo counseling. Bettencourt expressed his remorse for the death of Mark Jones. He explained that Jones had started the fight and at the time he had really believed that Jones was going to get a weapon to kill him and his crime partner. Three relatives of the victim spoke, including two brothers, Adam Jones and Nathan Jones, and a sister, Rebecca Weber. They opposed Bettencourt's release on parole and spoke of the pain of their loss.

While Rebecca Weber was speaking, Bettencourt interrupted her and was removed from the hearing, as indicated in the following colloquy:

"**Ms. Weber**: [¶] . . . [¶] But, you know, [Bettencourt's] admitted some selfishness, and I guess if you can manipulate someone to take care of the problem for you and you're involved, but you didn't really do it, then you can have what you want.

"**Inmate Bettencourt**: Don't try to implicate anybody else.

"**Presiding Commissioner Welch**: Remove him from the proceedings, would you?

"**Inmate Bettencourt**: I'm the one responsible for the crime (inaudible).

"**Presiding Commissioner Welch**: Remove him from the proceedings."

Thereafter, Rebecca Weber concluded her statement and the presiding commissioner stated, "Okay. I'll note for the record, the prisoner was removed because of an outburst. Counsel, during the recess if you counsel the prisoner that he will not be permitted to make outbursts in the hearing, then I will permit him to come back in for the decision. But if he cannot control himself, then I will have him removed again."

At the conclusion of the hearing, the Board issued a four-year denial of parole. The denial was based on the Board's conclusion that Bettencourt was not suitable for parole because the record showed that he would pose an unreasonable risk of danger to society or a threat to public safety if he was released from prison. The Board also addressed several parole unsuitability factors that formed the basis for its decision to deny parole.

The Board determined that the commitment offense was carried out in an especially cruel and callous manner, with "an exceptionally callous disregard for human suffering," and the motive was inexplicable or very trivial in relationship to the offense. The Board based its determination on several circumstances: the murder arose from Bettencourt's visit to the victim's home to talk about his girlfriend; Bettencourt's crime partner went with him; the victim was stabbed to death and his body disposed of; and the victim's body was mutilated by the stabbing with a screwdriver and a kitchen knife.

The Board also found that Bettencourt had a record of criminal conduct, including the commission of a subsequent offense in prison, and that he had "failed to profit from society's previous attempts to correct his criminality." In that regard, the Board noted that Bettencourt had been on juvenile probation and in juvenile camp.

The Board further found that Bettencourt had an unstable social history, which included his "early involvement in criminality" and his numerous contacts with law enforcement and incarceration as a juvenile. The Board also observed that Bettencourt's institutional behavior included 11 disciplinary reports.

Additionally, the Board determined that the psychological evaluations did not support Bettencourt's release on parole and instead indicated that a longer period of observation or treatment was needed, as well as ongoing involvement in a drug treatment program. The Board also noted that the district attorney and the relatives of the victim had opposed Bettencourt's release on parole.

Finally, the Board took into consideration Bettencourt's behavior during the hearing, stating "[t]he Panel was not impressed with the prisoner's ability

in this setting to control himself, to control his outbursts. And if that's indicative of how the prisoner would react in a free community after all this time, then the Panel has grave concerns."

With respect to the parole suitability factors, the Board acknowledged that Bettencourt had realistic parole plans and good family support, and that he had "programmed fairly well" and had been "disciplinary free" since 1998. The Board also mentioned that Bettencourt had received letters of support from three staff members as well as very good work reports. However, the Board concluded that the parole suitability factors did not outweigh the parole unsuitability factors.

### G. *Habeas Corpus Proceedings*

On June 4, 2004, Bettencourt filed a petition for writ of habeas corpus challenging the Board's decision and seeking release on parole. He asserted three grounds for his claim that the Board had erroneously denied parole: (1) the Board violated section 3041 and his due process rights by failing to properly consider and weigh the nature of his commitment offense, including consideration of the uniform term for similar offenses; (2) the parole denial was arbitrary and capricious because it is not supported by some evidence that his release would pose an unreasonable risk to public safety; and (3) reliance upon public outcry to deny parole violated his due process rights.

On September 7, 2004, the superior court ordered the Attorney General to show cause why Bettencourt was not entitled to the relief sought in his habeas corpus petition. The order stated, "Despite the weight of the evidence, the Board announced a conclusion that 'the offense was carried out in a dispassionate and calculated manner,' akin to first degree murder, and refused to set a parole date (even though [Bettencourt] has exceeded every applicable matrix designation). Need a court examine the record for 'some evidence' that the crime is first degree murder when the executive branch stipulated in the first instance that the crime would be 'fixed' and 'set' at 'second degree'? Does the Board have the power to ignore, and thus nullify, the plea? [¶] . . . [¶] Respondent should be able to explain what ultimate benefit [Bettencourt] was given. [¶] Respondent must address this, as well as every other, issue raised in the instant petition."

The Board subsequently filed a petition for writ of mandate in this court seeking extraordinary relief from the superior court's order. We granted the petition in *Board of Prison Terms v. Superior Court, supra,* 130 Cal.App.4th 1212, where we determined, among other things, that there is "no statutory or decisional authority that permits the superior court to issue an order to show cause that requires the respondent to address new claims not expressly or

implicitly raised in the original habeas corpus petition or supported by the factual allegations in the original habeas corpus petition, unless those claims were raised by the petitioner in a supplemental or amended habeas corpus petition filed with the permission of the court." (*Id.* at p. 1237.) We also recognized that "the superior court has the authority to invite amended or supplemental habeas corpus petitions in the interests of justice." (*Id.* at p. 1239.) Our peremptory writ of mandate directed the superior court to vacate its order to show cause and to reconsider its rulings in accordance with the views expressed in our opinion. (*Id.* at p. 1244.)

Thereafter, on December 29, 2005, the superior court issued a new order to show cause in which it directed the Attorney General to show cause why Bettencourt was not entitled to a new parole hearing and to file "a responsive pleading" in 30 days. In its order, the superior court acknowledged that the California Supreme Court's decision in *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*) "had foreclosed [Bettencourt's] claim that there should be proportionality review between his case and other cases of second degree murder."

However, in its December 29, 2005, order to show cause the superior court also indicated that the court found the Board's decision to deny parole questionable in two respects. First, the superior court stated that "[o]n these facts this Court questions the extent of the Board's ability to use the details and specifics of the stabbing against [Bettencourt] at all." The court further explained, "While the Board may be free to disbelieve [Bettencourt's] version of events, it may not freely invent, or speculate regarding, other possibilities. The Board must be able to point to evidence bearing 'indicia of reliability' in support of any alternative that it adopts."

Second, the superior court objected to the Board's finding that Bettencourt's motive for the commitment offense was inexplicable or very trivial in relationship to the offense. The court stated, "Since it could not be both 'inexplicable' and 'trivial' . . . this declaration is nothing more than a rote recitation of statutory criteria. It demonstrates that the Board decision did not result from a considered review of the evidence before it, and cannot justify a finding of unsuitability on those grounds."

On March 7, 2006, the Attorney General filed a return on behalf of Tom Carey, warden at California State Prison, Solano, in which the Attorney General argued that the Board's decision to deny parole should be upheld. Thereafter, on April 3, 2006, Bettencourt filed a motion seeking leave to file a supplemental habeas corpus petition and an extension of time to file a traverse. At the same time, Bettencourt filed a supplement to his original habeas corpus petition, in which he added the argument that he should be

released on parole in order to benefit from his plea bargain. On May 1, 2006, the trial court granted the motion, allowing Bettencourt to file a supplemental habeas corpus petition and extending the time to file a traverse.

Bettencourt filed a second supplement to his habeas corpus petition on June 1, 2006, in which he expanded on his argument that denial of parole violated his plea bargain. He also argued that the circumstances of the commitment offense should not count as a parole unsuitability factor because he had not stabbed the victim, and asserted that the Board had improperly failed to consider his young age at the time of the commitment offense and his subsequent maturation.

The superior court issued another order to show cause on June 30, 2006. The order directed the Attorney General to "show cause based on the claims and arguments presented in [Bettencourt's] supplemental petition received by this Court on June 1, 2006." On August 2, 2006, the Attorney General filed a request to stay the habeas corpus proceeding pending this court's ruling on the petition for writ of mandate challenging the June 30, 2006, order to show cause that the warden intended to file. Alternatively, the warden requested a 45-day extension of time to file a return to the supplemental petition. The trial court denied the stay request and the request for an extension of time. The Attorney General filed a second request for an extension of time in which to file a supplemental return on August 7, 2006, the same day the warden's petition for writ of mandate and request for extension was filed in this court. The petition for writ of mandate was summarily denied on August 14, 2006.

The trial court did not rule on the Attorney General's second request for an extension of time to file a return to the supplemental habeas corpus petition and the Attorney General did not file a return. On August 29, 2006, Bettencourt filed a motion in which he sought an order granting the relief sought in his original habeas corpus petition and the supplemental petitions on the ground that no return had been filed. In its order of September 1, 2006, the trial court found the warden in default and stated that no further briefing would be accepted.

### H. *The Superior Court's Order of September 27, 2006*

The superior court's order of September 27, 2006, granted Bettencourt's habeas corpus petition and directed the Board to "conduct a new hearing within 30 days, giving consideration to the absence of all [California Code of Regulations, title 15, section] 2402[, subdivision] (c)(1) factors and addressing the [California Code of Regulations, title 15, section] 2402, subdivision (d)(6) suitability factors as outlined herein."

In its order, the superior court stated that "[i]t was error, as a matter of law, for the Board to use the [commitment offense] itself to deny [Bettencourt]

parole." The superior court based this determination on its finding that Bettencourt's conduct "was limited to engaging the victim in an unarmed simple assault" and that Collier, Bettencourt's crime partner, "independently and without prior knowledge or encouragement of [Bettencourt] unilaterally undertook the killing." In so finding, the superior court relied upon the record of the Board hearing and parole decision pertaining to Collier in addition to the record of Bettencourt's Board hearing and parole decision, although Collier's records were not before the Board at the time of Bettencourt's hearing.

The superior court also stated that Bettencourt's "youth is central to an evaluation of the circumstances of the commitment offense." Citing a United States Supreme Court decision, *Roper v. Simmons* (2005) 543 U.S. 551 [161 L.Ed.2d 1, 125 S.Ct. 1183], the court explained that "now that [Bettencourt] is no longer the 18 year old who made that questionable decision the Board is required to acknowledge that his 'present age reduces the probability of recidivism.' ([Cal. Code Regs., tit.] 15, § 2402[, subd.] (d)(5).)"

The order further directed the Board to "explain the nexus between the remoteness of any static factors relied upon to find unsuitability (such as [Bettencourt's] prior relationships or juvenile activity) and today's assessment of [Bettencourt's] dangerousness. If the Board has reasons to believe that, at this time, those static factors are relevant to its determination, the basis for that conclusion shall be clearly articulated and not merely a 'makeweight rationalization' for a 'predetermined conclusion in search of justification.' [Citation.]"

The warden subsequently filed a timely notice of appeal from the order of September 27, 2006. We issued a writ of supersedeas staying the order until final determination of this appeal.

## III. DISCUSSION

On appeal, the warden makes two substantive arguments in support of his contention that Bettencourt's petition for writ of habeas corpus should be denied: (1) the superior court erred in ordering the Board to conduct a new parole hearing because some evidence supports the Board's decision that Bettencourt was unsuitable for parole; and (2) the order improperly directs the Board to hold a new hearing in a manner contrary to law. The warden also makes two procedural arguments: (1) Bettencourt's failure to file a traverse or otherwise object to the return constitutes a waiver of his objections to the return; and (2) the habeas corpus petition was untimely filed over 13 months after his administrative appeal of the Board's parole denial. We

will begin our analysis of the warden's claims with an overview of the statutory scheme for parole suitability decisions.

### A. *The Statutory Scheme for Parole Suitability Decisions*

■ The Board is authorized to determine whether a prisoner sentenced to an indeterminate prison term should be released on parole, in accordance with the provisions of section 3041.[4] Subdivision (b) of section 3041 provides in pertinent part: "The panel or the board, sitting en banc, shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

■ In determining whether the public safety requires the prisoner to serve a more lengthy period of incarceration rather than be released on parole, the Board is guided by the criteria listed in the California Code of Regulations. The Board must deny parole "if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." (Cal. Code Regs., tit. 15, § 2402, subd. (a).)[5] To assess that risk and thus determine the prisoner's suitability for parole, the Board must consider "[a]ll relevant, reliable information available to the panel." (§ 2402, subd. (b).)

Included in the relevant information that the Board may take into account in determining suitability for parole are circumstances that have been termed "parole suitability factors." (*Board of Prison Terms v. Superior Court, supra*, 130 Cal.App.4th at p. 1231.) The applicable regulations include the following parole suitability factors: (1) no juvenile record; (2) a stable social history; (3) signs of remorse; (4) the motivation for the crime was significant life stress; (5) battered woman syndrome; (6) no history of violent crime; (7) age; (8) realistic plans for the future; and (9) institutional behavior. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) These parole suitability factors are not

---

[4] Section 3041, subdivision (a) provides in part: "One year prior to the inmate's minimum eligible parole release date a panel of two or more commissioners or deputy commissioners shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the inmate was sentenced and other factors in mitigation or aggravation of the crime."

[5] All further references to section 2402 are to section 2402 of title 15 of the California Code of Regulations.

exclusive. Pursuant to section 2402, subdivision (b), the Board also may consider "any other information which bears on the prisoner's suitability for release."

The Board must also consider "parole unsuitability factors," which are circumstances that "each tend to indicate unsuitability for release." (Cal. Code Regs., tit. 15, § 2402, subd. (c).) Parole unsuitability factors include: (1) the commitment offense (whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner"); (2) a previous record of violence; (3) an unstable social history; (4) sadistic sexual offenses; (5) psychological factors; and (6) serious misconduct in prison or jail. (§ 2402, subd. (c).) The presence of several unsuitability factors may have a cumulative effect, because "[c]ircumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability." (§ 2402, subd. (b).)

█ The parole suitability and unsuitability factors are "general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board]." (Cal. Code Regs., tit. 15, §§ 2402, subds. (c), (d).) Consequently, "the precise manner in which the specified factors relevant to parole suitability are considered and balanced" lies within the "discretion exercised by the Board in making its decision" regarding parole suitability. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).)

However, individualized consideration of a prisoner's suitability for parole is required. "[T]he first responsibility of the parole authorities is to evaluate the suitability of an *individual* inmate for *safe* release, and, in making that assessment, to take into account all pertinent information and input *about the particular case* from the inmate's victims, the officials familiar with his or her criminal background, and other members of the public who have an interest in the grant or denial of parole to *this prisoner*." (*Dannenberg, supra*, 34 Cal.4th at p. 1086.)

## B.   *The Standard of Review*

The Board's decision regarding parole suitability is subject to limited judicial review under the " 'some evidence' " standard. (*Rosenkrantz, supra*, 29 Cal.4th at p. 652.) The " 'some evidence' " standard of review is "extremely deferential." (*Id.* at p. 665.) The reviewing court may not weigh the evidence, resolve conflicts in the evidence, or consider whether the evidence establishing suitability for parole "far outweighs" the evidence showing unsuitability. (*Id.* at p. 677.) Thus, the court may not substitute its own judgment for that of the Board. "[T]he court may inquire only whether

some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Id.* at p. 658.) Review under the "some evidence" standard "simply ensures that parole decisions are supported by a modicum of evidence and are not arbitrary and capricious." (*Id.* at p. 626.)

"[W]e shall review the trial court's decision and the contentions of the parties in light of the materials that properly were before that court." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Where, as here, "the trial court's findings were based solely upon documentary evidence, we independently review the record." (*Ibid.*)

## C. *Analysis*

The warden contends that the Board's decision to deny parole must be upheld under the extremely deferential "some evidence" standard of review because some evidence supports the Board's findings that Bettencourt is unsuitable for parole based on the circumstances of the commitment offense, Bettencourt's criminal history, his conduct while incarcerated, his unstable social history, the psychological evaluations, the opposition of the district attorney and the victim's family members, and Bettencourt's behavior at the parole hearing. We will address each parole unsuitability factor in turn.

### 1. *The Commitment Offense*

According to the warden, some evidence supports the Board's finding that the circumstances of the commitment offense indicated that Bettencourt was unsuitable for parole, because Bettencourt was an accomplice who did nothing to stop his crime partner from stabbing to death a victim who fought for his life and also because the motive for the murder was trivial in relation to the offense. The warden also challenges the superior court's finding that Bettencourt's age of 18 at the time of the commitment offense indicates parole suitability, noting that California Code of Regulations, title 15, section 2402, subdivision (d)(7) expressly provides that age indicates parole suitability only where the prisoner's present age " 'reduces the probability of recidivism.' " Alternatively, the warden asserts that the Board was entitled to determine that the parole unsuitability factors outweighed the parole suitability factors, including Bettencourt's youth at the time of the commitment offense.

Bettencourt disagrees, arguing that the superior court properly considered relevant evidence from Collier's parole hearing, which showed that Bettencourt's own actions did not cause Jones's death, while the Board improperly considered aspects of the murder that Bettencourt did not "himself

intend or commit." Bettencourt further contends that no evidence supports the Board's finding that the commitment offense was particularly egregious, because his actions were no more than the minimum necessary for a conviction of second degree murder and neither Bettencourt nor his crime partner attempted to prolong the victim's suffering or torture him. There was also no evidence to support the Board's finding that the commitment occurred in a dispassionate and calculated manner, according to Bettencourt, because the murder "was unplanned and resulted from an emotionally charged personal conflict." Similarly, Bettencourt maintains that no evidence supports the Board's finding that his motive was very trivial in relation to the commitment offense, since the evidence indicated that "the killing in this case was unplanned and motivated by fear and anger over a personal conflict."

Bettencourt additionally claims that the 25-year-old commitment offense is no longer a reliable predictor of his current dangerousness. He relies on the federal court decisions in *Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, *Irons v. Carey* (9th Cir. 2007) 479 F.3d 658, and *Rosenkrantz v. Marshall* (C.D.Cal. 2006) 444 F.Supp.2d 1063, as well as the California appellate court decisions in *In re Lee* (2006) 143 Cal.App.4th 1400 [49 Cal.Rptr.3d 931] and *In re Elkins* (2006) 144 Cal.App.4th 475 [50 Cal.Rptr.3d 503], for the proposition that "[n]umerous state and federal courts have held that the passing of 20 or more years renders the commitment offense unreliable as a factor in predicting a prisoner's current level of dangerousness, at least when the prisoner has not engaged in any violence during his prison term."

■ Pursuant to California Code of Regulations, title 15, section 2402, subdivision (c)(1), a circumstance tending to indicate unsuitability for parole is that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include: [¶] (A) Multiple victims were attacked, injured or killed in the same or separate incidents. [¶] (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder. [¶] (C) The victim was abused, defiled or mutilated during or after the offense. [¶] (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. [¶] (E) The motive for the crime is inexplicable or very trivial in relation to the offense." The Board may also consider the prisoner's "behavior before, during and after the crime." (§ 2402, subd. (b).)

The commitment offense alone may constitute a sufficient basis for denying parole. (*Dannenberg, supra,* 34 Cal.4th at p. 1094.) However, to avoid violation of section 3041, subdivision (a), which provides that parole should normally be granted, "an offense must be 'particularly egregious' to justify the denial of parole. [Citation.]" (34 Cal.4th at p. 1095.) " '[P]articularly

egregious' " means that "the violence or viciousness of the inmate's crime must be more than *minimally necessary to convict him [or her] of the offense for which he [or she] is confined.*" (*Ibid.*, italics added.)

■ In the present case, the Board did not rely solely on the commitment offense in determining that Bettencourt was not suitable for parole. The Board also considered Bettencourt's criminal history, his conduct while incarcerated, his unstable social history, the psychological evaluations, the opposition of the district attorney and the victim's family members, and Bettencourt's behavior at the parole hearing. Therefore, we must determine whether some evidence supports the Board's decision that the circumstances of the commitment offense indicated that Bettencourt was unsuitable for parole because he "committed the offense in an especially heinous, atrocious or cruel manner." (Cal. Code of Regs., tit. 15, § 2402, subd. (c)(1); see *Rosenkrantz, supra,* 29 Cal.4th at p. 678.) Having independently reviewed the record, we determine that some evidence supports the Board's finding.

First, some evidence supports the finding that the commitment offense was committed in a dispassionate and calculated manner, based on the evidence showing that while Bettencourt was beating the victim his crime partner, Collier, determined that the screwdriver was an ineffective stabbing weapon and purposefully replaced the screwdriver with a kitchen knife in order to kill the victim. Bettencourt and his crime partner then attempted to conceal the murder by cleaning up the victim's apartment while his body lay nearby, wrapping the body in a bedspread and putting it in the back of a pickup truck, and taking the body to a location where they could dump it over a cliff. These facts also provide some evidence that the body was defiled (by being dumped over a cliff) and mutilated (by multiple stab wounds). Additionally, some evidence supports the Board's finding that the motive was trivial in relation to the offense, since the murder occurred after Bettencourt confronted the victim with the intention of warning him away from Bettencourt's girlfriend.

■ However, Bettencourt contends that the actions of Collier, his crime partner, in stabbing the victim to death should not be imputed to him, a mere accomplice, in a parole consideration hearing. We disagree. Bettencourt provides no authority to support his contention and we believe that California Supreme Court authority supports a contrary view. Our Supreme Court has stated that "[a]ccomplice liability is 'derivative,' that is, it results from an act by the perpetrator to which the accomplice contributed. [Citation.] '[W]hen an accomplice chooses to become a part of the criminal activity of another, she [or he] says in essence, "your acts are my acts," and forfeits her personal identity. We euphemistically may impute the actions of the perpetrator to the accomplice by "agency" doctrine; in reality, we demand that she [or he] who chooses to aid in a crime forfeits her [or his] right to be treated as an

individual.' [Citation.]" (*People v. Prettyman* (1996) 14 Cal.4th 248, 259 [58 Cal.Rptr.2d 827, 926 P.2d 1013].) Thus, under the principles of accomplice liability, Bettencourt is equally culpable for the murder of Mark Jones although he did not actually stab Jones to death.

We are also not convinced by Bettencourt's argument that the 1981 commitment offense could not indicate parole unsuitability over 20 years later at the time of the July 24, 2002, parole hearing, due to the passage of time. The lower federal court decisions cited by Bettencourt are not binding on this court. (*People v. Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].) Moreover, while the decisions of the federal appellate courts may be persuasive (*ibid.*), we do not find them so where, as here, they are contrary to California Supreme Court authority and California statutes and regulations.

▌ The applicable regulations provide that any of the factors listed in California Code of Regulations, title 15, section 2402 as tending to show parole suitability and unsuitability, including the unchanging factor of the commitment offense, may be relevant to the Board's determination of current risk. The California Supreme Court has stated, "The regulations do set detailed standards and criteria for determining whether a murderer with an indeterminate life sentence is suitable for parole. ([§] 2402, subds. (b)–(d).)" (*Dannenberg, supra,* 34 Cal.4th at p. 1080.) Additionally, our Supreme Court has clearly instructed that "[a] prisoner's crime constitutes a factor tending to demonstrate unsuitability for parole, where the prisoner committed the offense in an especially heinous, atrocious, or cruel manner. ([§] 2402, subd. (c)(1).)" (*Rosenkrantz, supra,* 29 Cal.4th at p. 678; see *Dannenberg, supra,* 34 Cal.4th at p. 1080.)

▌ Moreover, rather than providing any support for Bettencourt's contention that the passage of more than 20 years negates the commitment offense or any other unchanging factor as an indication of parole unsuitability, our Supreme Court has further instructed that section 3041, subdivision (b) makes "clear that the parole authority would have the express power and duty, in an individual case, to *postpone* the fixing of a firm release date, and thus to continue the inmate's *indeterminate* status within his or life-maximum sentence, if it found that the circumstances of the prisoner's crime or criminal history presented a continuing risk to public safety." (*Dannenberg, supra,* 34 Cal.4th at p. 1090.) In other words, "if the circumstances of a particular murder persuade the Board that the prisoner who committed it is presently too dangerous to grant a fixed parole release date, the Board may deny parole without deciding when the inmate will be released, and without considering how the prisoner's actual period of confinement may compare with those served by others who committed similar crimes." (*Id.* at p. 1080.)

The applicable regulations also indicate that a lengthy passage of time from the date of the commitment offense is not a circumstance that necessarily negates the relevance of any parole unsuitability factor. California Code of Regulations, title 15, section 2402, subdivision (a) provides in part, "Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

Thus, the relevant California authorities, including the decisions of the California Supreme Court and the applicable statutes and regulations, authorize the Board to consider the circumstances of the commitment offense in determining whether a life prisoner is suitable for parole, regardless of the passage of time from the date of the offense. As an intermediate appellate court, we are limited to determining, as discussed above, whether some evidence supports the Board's determination that Bettencourt's commitment offense tended to show that he was unsuitable for parole because the offense was committed "in an especially heinous, atrocious or cruel manner." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1); see *Dannenberg, supra*, 34 Cal.4th at p. 1084.)

■ We are similarly unconvinced by Bettencourt's argument that his age of 18 at the time of the commitment offense is a parole suitability factor that must be weighed by the Board and the Board's failure to give significant weight to that factor was improper. Assuming, without deciding, that youthful age at the time of the commitment offense is a circumstance that the Board may consider although it is not expressly included in the parole suitability factors set forth in California Code of Regulations, title 15, section 2402, subdivision (d), because the Board may consider "[a]ll relevant, reliable information" (§ 2402, subd. (b)), the Board is authorized to give little or no weight to that circumstance. Section 2402, subdivision (d) expressly provides, "the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the [Board] panel." As the reviewing court, we may not reweigh the evidence pertaining to any circumstance indicating parole suitability or unsuitability, including youthful age at the time of commitment. (*Rosenkrantz, supra*, 29 Cal.4th at p. 677.)

For these reasons, we conclude that some evidence supports the Board's decision that the offense was committed in an especially heinous, atrocious or cruel manner.

### 2. *Criminal History*

The warden argues that some evidence supports the Board's decision to deny parole on the additional parole unsuitability factor of Bettencourt's

criminal history, because the record shows that previous attempts to rehabilitate him were futile and he was convicted of a crime, possession of an inmate-manufactured stabbing weapon, after he was imprisoned on the commitment offense.

Bettencourt responds that the Board erred in finding that his insignificant, 25-year-old, nonviolent criminal history indicated parole unsuitability. According to Bettencourt, prior to the commitment offense he had committed only minor traffic violations and failure to appear in court, plus "a few non-violent property offenses [that] were committed as a juvenile, most of which were associated with joyriding in his parents' car without their permission."

The parole unsuitability factors include a previous record of violence: "The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(2).) Conversely, a factor tending to show suitability for parole is the lack of a juvenile record: "The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims." (§ 2402, subd. (d)(1).) Another factor tending to show parole suitability is that "[t]he prisoner lacks any significant history of violent crime." (§ 2402, subd. (d)(6).)

For several reasons, we are not convinced by Bettencourt's argument that his criminal history cannot indicate parole unsuitability. First, he has overlooked California Code of Regulations, title 15, section 2402, subdivision (b), which provides in part, "All relevant, reliable information available to the [Board] shall be considered in determining suitability for parole. Such information shall include . . . past criminal history, including involvement in other criminal misconduct which is reliably documented . . . ." Thus, evidence that Bettencourt's criminal history included violent crimes is not required for a finding of parole unsuitability and the Board may consider, among other aspects of a prisoner's criminal history, that the prisoner has a juvenile record of committing crimes with a potential of personal harm to victims. (§ 2402, subd. (d)(1).) Here, the record shows that Bettencourt has such a record, since he was committed to the Santa Clara boys' ranch after committing burglary, auto theft, and joyriding.

Additionally, Bettencourt's criminal history, including his conviction of crimes after his commitment to the Santa Clara boys' ranch and after his imprisonment on the commitment offense, revealed the "repetitive and recidivist nature of his conduct," which was "a legitimate factor for the Board to weigh in favor of a denial of parole." (*In re Fuentes* (2005) 135 Cal.App.4th 152, 163 [37 Cal.Rptr.3d 426].)

Accordingly, we determine that some evidence supports the Board's finding that Bettencourt's criminal history was a factor tending to show parole unsuitability.

### 3. *Social History*

■ The applicable regulations also provide that a prisoner's social history is a factor that may be considered in determining parole suitability. A factor tending to show unsuitability is that "[t]he prisoner has a history of unstable or tumultuous relationships with others." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(3).) On the other hand, a factor tending to show suitability is "[t]he prisoner has experienced reasonably stable relationships with others." (§ 2402, subd. (d)(2).)

Here, the Board determined that Bettencourt had an unstable social history that included his "early involvement in criminality" and his numerous contacts with law enforcement and incarceration as a juvenile. The warden contends that some evidence supports that finding, while Bettencourt disagrees, arguing that there is no evidence to show that his 25-year-old social history demonstrates his current dangerousness. He asserts that the "record does not reveal any particular instability of social history or relationships much beyond an average teenager's experiences."

We reiterate that the applicable standard of review does not allow the reviewing court to weigh the evidence, resolve conflicts in the evidence, or consider whether the evidence establishing suitability for parole "far outweighs" the evidence showing unsuitability. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) We are limited by the extremely deferential "some evidence" standard to a determination of whether a parole decision is based on the factors specified by the applicable statutes and regulations and is supported by a modicum of evidence. (*Id.* at p. 626.)

In the present case, the record reflects that Bettencourt drank alcohol and used drugs, including marijuana and cocaine. These facts constitute a modicum of evidence in support of the Board's finding that Bettencourt has an unstable social history.

### 4. *Institutional Behavior*

Institutional behavior constitutes a parole unsuitability factor when "[t]he prisoner has engaged in serious misconduct in prison or jail." (Cal. Code

Regs., tit. 15, § 2402, subd. (c)(6).) On the other hand, parole suitability is indicated where the prisoner's "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." (§ 2402, subd. (d)(9).)

The warden contends that some evidence supports the Board's finding that Bettencourt's institutional behavior tended to show that he was unsuitable for parole, because he was convicted of possession of a weapon in prison and had accumulated a total of 11 CDC 115 disciplinary reports. Bettencourt disputes this, pointing out that his 1982 conviction for possession of a weapon occurred long ago; the majority of his other offenses occurred between 10 and 18 years before the July 24, 2002, parole hearing; and that he has been disciplinary free since 1998. According to Bettencourt, "This non-violent and largely remote disciplinary record does not provide reliable evidence that [his] release would pose a danger to society."

Having reviewed the record, we find that some evidence supports the Board's determination that Bettencourt's institutional behavior indicated that he was unsuitable for parole. It cannot be disputed that Bettencourt has engaged in serious misconduct while in prison. After Bettencourt was imprisoned on the commitment offense, he was convicted of a crime, possession of an inmate-manufactured stabbing weapon, and received a sentence of 16 months. He subsequently received 10 more CDC 115 disciplinary reports, which documented "misconduct believed to be a violation of law which is not minor in nature." (*In re Gray*, *supra*, 151 Cal.App.4th at p. 389.) And, as we have discussed, the passage of time does not necessarily negate any parole unsuitability factor. Accordingly, the Board was not required to ignore Bettencourt's serious misconduct while in prison because his last disciplinary report was received in 1998, approximately four years prior the July 24, 2002, parole hearing.

### 5. *Psychological Evaluations and Behavior at the Parole Hearing*

The applicable regulations also provide that the Board may consider psychological factors in determining parole suitability. Pursuant to California Code of Regulations, title 15, section 2402, subdivision (c)(5), a factor tending to show unsuitability is "[t]he prisoner has a lengthy history of severe mental problems related to the offense." Additionally, section 2402, subdivision (b), provides that the Board may consider "any conditions of treatment or control . . . ."

The Board determined that the psychological evaluations did not support Bettencourt's release on parole and instead indicated that a longer period of observation or treatment was needed, as well as ongoing involvement in a drug treatment program. Bettencourt contends that the record does not support the Board's finding that he needs further therapeutic programming.

We find that the psychosocial evaluation provided by Dr. Donoviel in connection with Bettencourt's July 24, 2002, parole hearing constitutes some evidence of psychological factors tending to show parole unsuitability. Dr. Donoviel concluded that the risk that Bettencourt would commit future violent behavior was "no greater than for others in society" only if Bettencourt received positive recognition and there were "no significant threats to his narcissistic ego." Dr. Donoviel recommended that Bettencourt receive individual psychotherapy to achieve "[m]odification of his character structure." Thus, the Board could infer from Dr. Donoviel's report that Bettencourt's release on parole would pose an unreasonable risk of danger to society unless he received psychotherapy treatment to enable him to avoid responding violently when his narcissistic ego was threatened.

The Board had further evidence that the psychological factors did not favor Bettencourt's release, consisting of the psychological testing results and Bettencourt's behavior at the July 24, 2002, parole hearing. Dr. Donoviel reported that Bettencourt's test results were consistent with "individuals [who] are noted to have problems with emotional control. They tend to overuse denial to control aggressive impulses. While they are generally over controlled they occasionally may have angry/violent outbursts that cause concern or embarrassment." The record reflects that Bettencourt had two such incidents during the parole hearing and was consequently removed from the hearing. The Board then concluded that Bettencourt's behavior caused concern as to how Bettencourt would behave if free in the community.

Bettencourt argues that the Board improperly considered his behavior at the parole hearing because his "brief interjections do not demonstrate an unreasonable risk of current dangerousness. Bettencourt's two sentences did not involve any vulgarity or threats. He did not harangue anyone. Bettencourt's statements consisted only of assertions that he was responsible for the crime." In so arguing, Bettencourt implicitly contends that the Board improperly gave weight to his behavior at the July 24, 2002, parole hearing in determining whether he was suitable for parole. We are not persuaded, because, as we have discussed, as the reviewing court we are not authorized to reweigh the evidence pertaining to parole suitability or unsuitability. We may only consider whether some evidence supports the Board's finding of unsuitability and we make that finding with respect to psychological factors in light of the psychological evaluations and Bettencourt's behavior at the parole hearing.

### D. *Conclusion*

■ For the reasons discussed above, we conclude that some evidence supports the Board's finding that Bettencourt was unsuitable for parole based on the factors of the commitment offense, past criminal history, social history, institutional behavior, and psychological evaluations and behavior at the parole hearing. We also find that the Board properly considered the opposition of the district attorney and the victim's family members to Bettencourt's release on parole. Pursuant to sections 3042 and 3046, subdivision (c),[6] the Board must consider the district attorney's statement and recommendation in determining parole suitability. (*Dannenberg, supra,* 34 Cal.4th at pp. 1084–1085.) The Board may also consider victim impact statements by members of the victim's immediate family, pursuant to section 3043, subdivision (b).[7]

Having reached this conclusion, we need not address the warden's additional contention that the superior court improperly directed the Board to hold a new hearing in a manner contrary to law[8] or the warden's claims of procedural error. Because some evidence supports the Board's decision that Bettencourt is unsuitable for parole, the decision must be upheld and we will reverse the superior court's order granting Bettencourt's petition for a writ of habeas corpus.

---

[6] Section 3042, subdivision (a) provides, "At least 30 days before the Board of Prison Terms meets to review or consider the parole suitability or the setting of a parole date for any prisoner sentenced to a life sentence, the board shall send written notice thereof to each of the following persons: the judge of the superior court before whom the prisoner was tried and convicted, the attorney who represented the defendant at trial, the district attorney of the county in which the offense was committed, the law enforcement agency that investigated the case, and where the prisoner was convicted of the murder of a peace officer, the law enforcement agency which had employed that peace officer at the time of the murder."

Section 3046, subdivision (c) provides, "The Board of Prison Terms shall, in considering a parole for a prisoner, consider all statements and recommendations which may have been submitted by the judge, district attorney, and sheriff, pursuant to Section 1203.01, or in response to notices given under Section 3042, and recommendations of other persons interested in the granting or denying of the parole. The board shall enter on its order granting or denying parole to these prisoners, the fact that the statements and recommendations have been considered by it."

[7] Section 3043, subdivision (b) provides that "The victim, next of kin, two members of the victim's immediate family, or two representatives designated for a particular hearing by the victim or, in the event the victim is deceased or incapacitated, by the next of kin in writing prior to the hearing have the right to appear, personally or by counsel, at the hearing and to adequately and reasonably express his, her, or their views concerning the crime and the person responsible, except that any statement provided by a representative designated by the victim or next of kin shall be limited to comments concerning the effect of the crime on the victim."

[8] We observe this court has previously ruled that the trial court exceeds its jurisdiction when the court precludes the Board from considering all relevant, reliable information. (*In re Weider* (2006) 145 Cal.App.4th 570, 590–591 [52 Cal.Rptr.3d 147]; *In re DeLuna* (2005) 126 Cal.App.4th 585, 599–600 [24 Cal.Rptr.3d 643].)

## IV. DISPOSITION

The superior court's order granting defendant Daniel Bettencourt's petition for writ of habeas corpus is reversed, and the matter is remanded to the superior court with directions to enter a new order denying the petition.

Mihara, J., and McAdams, J., concurred.

On October 19, 2007, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied February 20, 2008, S159033.